[No. 1608.]

ORLANDO CARDELLI, ET AL., APPELLANT, v. THE COM-
STOCK TUNNEL COMPANY, A CORPORATION, ET AL.,
RESPONDENT.

WATERS—NATURAL STREAM—DRAINAGE— PUMPING—APPROPRIATION— INJUNC-
TION—FACTS—FINDINGS—APPEAL.   1.  Where, on a motion for injunction
to restrain·defendant from interfering with plaintiff's alleged right to
use one-half the waters flowing through defendant's tunnel, the evi-
dence was conflicting as to the facts, and the trial court found the
facts against the plaintiff, its order denying the injunction should not
be reversed.

2.  Where all the waters flowing through a tunnel are derived from drainage
of a mine and of the country between the mine and the mouth of the
tunnel, and from pumpings into the tunnel from lower levels, and the
water which has been used in the mine for electrical purposes, such
tunnel is not a natural stream, and its waters are not subject to
appropriation.

APPEAL from the First Judicial District Court, Lyon
County;  C. E. Mack, Judge.

Action by Orlando Cardelli and others against the Com-
stock Tunnel Company and others.   From an order refusing
an injunction, the plaintiffs appeal.   **Affirmed.**

The facts sufficiently appear in the opinion.

*Torreyson & Summerfield* and *John Lothrop*, for Appel-
lants:

I.   The act of Congress of July 25, 1866, entitled "An act
granting A. Sutro the right of way and granting other priv-
ileges to aid in the construction of a draining and exploring
tunnel to the Comstock lode in the State of Nevada," gives
to Sutro no right to the waters flowing out of said tunnel.
The tunnel was not run or constructed for the purpose of
developing water to be used or sold for agricultural purposes.
In order to give the tunnel company a right to the use of
these waters, they must be appropriated and put to some
beneficial use, and they are only entitled to them to the
extent of their appropriation.   It is not the exclusive prop-
erty of the company and subject to its exclusive disposal.
(14 Stats. U. S. at Large, 242; *Dick* v. *Caldwell*, 14 Nev. 167;
*Barnes* v. *Sabron*, 10 Nev. 217; *McKinney* v. *Smith*, 21 Cal.
374; *Union M. & M. Co.* v. *Dangberg, et al.*, 81 Fed. 73.)

II.   In the absence of special custom it has been held that

artificial watercourses are not distinguished from natural ones, and that a title may be gained by user (for the period of limitation) as well to the former as to the latter. (Angell on Watercourses, 7th ed. sec. 206, 206a; *Arkwright* v. *Gell*, 5 M. & W. 220; *Wood* v. *Waud*, 3 Exch. 748, 776, 777; *Maeris* v. *Bicknell*, 7 Cal. 262.)

III. For a full discussion of the rights in artificial streams see: Goddard's Law of Easements, pp. 241–247.

IV. The Sutro tunnel was not dug for the purpose of creating an artificial stream of water. It was not dug or constructed for the purpose of creating or developing water, or for the purpose of appropriating any waters which might flow from said tunnel upon any agricultural lands. It would only be entitled to such of the waters flowing therefrom for agricultural purposes as it may have appropriated or put to a beneficial use. It has no absolute ownership to the waters flowing out of said tunnel. The plaintiffs have the right to insist that the water continues to flow as it did when they first made the appropriation. (Kinney on Irrigation, sec. 249; Goddard's Law of Easements, p. 245.)

*W. E. F. Deal* and *W. E. Winnie*, for Respondents:

I. Plaintiffs' title to the water is based solely upon the alleged fact that defendants, their predecessors in interest and grantors, have, since the ..... day of ..............., 1879, "consented" to plaintiffs' use of said water and the continuous use thereof.

II. Prescription must rest upon open, notorious, continuous use under a claim of right, and not upon secret use.

III. Assuming as a fact (but which is not a fact), that for twenty years the plaintiffs used the waters as alleged in their complaint, and that in the year 1899, for the first time, the defendant corporation and its lessees took the water from plaintiffs and carried it to their own land and used all of it by means of a ditch constructed in 1899, which carries the waters across the Carson river to the defendant corporation's land where it is used by the corporation's lessees to irrigate land belonging to the corporation, but leased to the defendant Ceresola, or that it used all of said waters since the year 1899 to irrigate land belonging to the corporation defendant

lying between the Cardelli ditch and the mouth of the tunnel, or east of the Cardelli ditch near the ice house, yet we maintain under this state of facts, under the evidence in this case, that plaintiffs have no right whatever to any of the waters flowing from the tunnel, that such waters are just as absolutely the property of the corporation defendant as if such water were manufactured each day from oxygen and hydrogen by the corporation defendant, and that none of the principles which apply to the waters of natural streams are applicable to the water of the character here in question.

IV.    No right to the waters here in question can be acquired by prescription, or by appropriation and use as against the owner of the tunnel.    The following authorities and decisions are applicable to waters of the character here in question: *Willow Creek Irrigation Co.* v. *Sarah C. Michaelson*, 6 No. 2, vol. 51, L. R. A. p. 280, and authorities cited in note; 60 Pac. R. p. 948; Kinney on Irrigation, sec. 297, p. 474; Gould on Waters, 2d ed. sec. 225, p. 445; *Crescent City M. Co.* v. *Silver King M. Co.*, 54 Pac. 244 (Utah); *Arkwright* v. *Gell*, 5 M. & W. 202; *Greatrex* v. *Hayward*, 8 Ex. Rep. 291; Gould on Waters, sec. 279, p. 537, sec. 352, p. 634 (2d ed.), sec. 34, p. 62; Kinney on Irrigation, p. 478, sec. 29; Gould on Waters (Percolations), 2d ed. sec. 280; *Hargrave* v. *Cook*, 41 Pac. 18–20; *Gould* v. *Eaton*, 44 Pac. 319; *Southern Pac. Co.* v. *Dufour*, 30 Pac. 783; *Hanson* v. *McCue*, 42 Cal. 307; *Barnes* v. *Sabron*, 10 Nev. 217.

V.    Assuming that Adolph Sutro did consent that plaintiffs take and use the water, that consent conferred no right upon plaintiffs, for the reason that such consent is not shown to have been within the scope of his authority.    (*Yellow Jacket Co.* v. *Stevenson*, 5 Nev. 228; *Hillyer* v. *Overman Co.*, 6 Nev. 51; *Clarke* v. *Lyon Co.*, 7 Nev. 76.)

VI.    The cases entitled *Barnes* v. *Sabron*, 10 Nev. 217; *Dick* v. *Caldwell*, 14 Nev. 167; *McKinney* v. *Smith*, 21 Cal. 374, have no bearing upon cases of the character of this case. In each case the waters of a stream naturally flowing were involved.

VII.    The counsel for plaintiffs are unfortunate in the citation of their authorities.    For instance, Goddard's Law of Easements, p. 243, states: "If, for instance, a stream

originates from the pumping of water from a mine, there can be no doubt the character of that stream is temporary, although it may happen that the pumping may continue for a hundred years. It must be seen that the reason why a right to the uninterrupted flow of water of an artificial stream  *  *  *  is that the temporary nature of the stream precludes a presumption of a grant of a permanent right, and such a stream as the one here in question is a temporary one, although it may happen that the pumping will continue for a hundred years."

VIII. Assuming, for the sake of argument, that consent was given by Mr. Sutro, it cannot be construed as anything more than a license. "The user to give title must be adverse. It must be such a specific assertion of right as to expose the party to an action if as a matter of fact he had no right. It must not in any way be permissive; a license is a complete rebuttal to the presumption of an adverse user." (Am. & Eng. Ency. Law, 1st ed. vol. 19, pp. 12 to 15, and authorities cited in notes.)

*Torreyson & Summerfield* and *John Lothrop*, for Appellants, in reply:

I. In *Crescent M. Co.* v. *Silver King M. Co.*, 54 Pac. Rep., at page 245, the court says: "The waters issuing from the artificial tunnel into the lake are found to be underground percolating waters from the mining claim of defendant." But in the case at bar there is no testimony to show that defendants are the owners of any mining claim or that said tunnel was dug for the purpose of draining any mining claim of defendant. On the contrary, the testimony shows that said tunnel was dug for the purpose of draining mines belonging to other and different corporations.

II. The testimony shows that nine-tenths of the waters flowing through the tunnel come from pumping water from other mines and not from percolating waters. What right has this defendant to say we shall not use the waters pumped into this tunnel by the mining companies? What control has it over them? If defendant's theory is correct, it would only be entitled to the percolating waters and to none of the waters pumped into the tunnel from the mines.

III.  The authorities cited upon the doctrine of percolating waters can only apply to such waters as are percolating, and not to waters pumped into the tunnel and allowed to run or pass through the same, and the court will see from an examination of the authorities cited by counsel for defendant that this must be true.  Every case cited by counsel for respondent shows that the water developed was developed upon and in soil belonging to the party running the tunnel, and upon and in mines belonging to said person.

IV.  In *McBroom* v. *Thompson*, 25 Or. 559, at page 566, the court says:  "An executed license is treated like a parol agreement in equity; it will not allow the statute to be used as a cover for fraud; it will not permit advantage to be taken of the form of the consent, although not within the statute of frauds, after large expenditures of money or labor have been invested in permanent improvements upon the land, in good faith, upon the reliance reposed in such consent.  To allow one to revoke his consent when it was given or had the effect to influence the conduct of another and cause him to make large investments would operate as a fraud, and warrant the interference of equity to prevent it."  To the same effect are:  *Combs* v. *Slayton*, 19 Or. 99; *Morton Brewing Co.* v. *Morton*, 47 N. J. Eq. 158–162; *Lawrence* v. *Springer*, 31 Am. St. Rep. 717; *Lee* v. *McLeod*, 12 Nev. 280–4–5; 18 Am. & Eng. Ency. Law, 2d ed. p. 1145, n. 8.  A license may arise from merely permitting another to do a certain thing repeatedly.  (18 Am. & Eng. Ency. Law, 2d ed. p. 1133, n. 4.)

UPON PETITION FOR REHEARING.

*Torreyson & Summerfield* and *John Lothrop*, for Petitioner:

I.  We do not believe the court intended to decide that the defendant company had the right, or has the right, to prevent plaintiffs from using the waters flowing from the tunnel at a time and when defendants are not using these waters.  We do not believe the court intended to decide that the defendant company when not using the waters has the right to turn the same under the Cardelli ditch and allow them to flow into the Carson river, and prevent plaintiffs from using them.  We do not believe the court intended to decide that

plaintiffs could make no use of these waters during the non-irrigating season, and when defendants were not using the same, but such is the effect of the decision. Suppose more water flows from the tunnel than defendants make any use of? Have plaintiffs not the right to the surplus? The testimony shows that while the flow from the tunnel was not uniform, yet there was always a flow. Most of it is water pumped from the mines on the Comstock lode. It cannot be said that under the decisions cited in support of the opinion of the court that this defendant, or its predecessors in interest, owned the water pumped from the mines on the Comstock. This water the mining companies created—not the defendant—and if any one owns it it is the mining companies. If this be a fact, then this defendant has no more right to it, except by appropriation and use, than the plaintiff.

II. The Sutro tunnel was constructed for the purpose of draining the Comstock mines, not for the purpose of procuring water for agricultural or any other beneficial purpose, but solely for the purpose of making the mining companies on the Comstock lode pay royalty upon each ton of ore extracted from said mines for the use of the tunnel in permitting the waters from the mines to flow through it. We think this court by its judgment has given the defendants the legal power and authority to take and use property, of which in their testimony they expressly deny being the owners.

III. We respectfully submit that a rehearing should be granted, and we urge upon the court that, for the benefit of all parties litigant in this case, it determine the question as to the right of these plaintiffs to divert the waters flowing out of said tunnel when not in use by the defendant company, and also the right of the plaintiff to divert these waters and make a beneficial use of them during the non-irrigating season.


By the Court, FITZGERALD, J.:

This is an action to determine the plaintiffs' alleged right to one-half of the waters flowing and to flow from the Sutro tunnel, for $2,800 damages for defendants' interference with said alleged right, and for a perpetual injunction and

order restraining said defendants from interfering with said alleged right in future. The waters in controversy may, from the testimony in the case, be thus described, as to their source, nature, and situation:

On the 4th of February, 1865, the legislature of the State of Nevada passed an act (Laws 1864–65, c. 26) with the following title: "An act granting the right of way, and authorizing A. Sutro, and his associates, to construct a mining and draining tunnel." Sections 1 and 2 of said act are as follows:

"SECTION 1. A. Sutro, and his associates, successors and assigns, shall, for the next fifty years ensuing, from and after the approval of this act, have, possess and enjoy the exclusive privilege of the right of way, and to run, construct and excavate a tunnel running into the Comstock lode, from any point to be selected in the foot hills of the Carson River valley, within the boundaries of Lyon county, and between Corral cañon and Webber cañon; also, to sink mining shafts along the line or course of said tunnel, and connecting with the same at such points as may be selected by said parties; *provided, however,* the right of way hereby granted for said tunnel shall in no manner or in any wise interfere with any rights heretofore acquired in and to the said Comstock lode, or any other lode along the line, or in the vicinity of said tunnel, or any rights of property heretofore acquired by any person or corporation; *and, provided, further,* that said right of way for said tunnel shall in no wise interfere with the rights of miners, according to the laws and customs of this state.

"SEC. 2. That the object of said tunnel being for the purpose of draining the Comstock lode, and all other lodes along its line of direction or course, and for the discovery and development of other lodes through which the same may pass, and for the general purpose of advancing the mining interest of this state, the rate, price or sum of money to be charged for the benefit derived by the persons, companies or corporations along the line of said tunnel, and others who may be benefited by the drainage of their mines or lodes, and freeing the same from the flow of water therein, shall be whatever sum or sums of money, or stock, which may, or shall be agreed upon by and between the corporations, person or persons to be benefited as aforesaid; and the grantee

herein, his associates, successors or assigns, and the said A. Sutro and his associates, successors and assigns, shall have the right to receive and collect all sums of money, or stock which said persons, companies or corporations shall contract to pay; and in default of the payment of the same according to the tenor and condition of such contract or contracts, the said A. Sutro, and his associates, their successors or assigns, shall have the right, and are hereby authorized and empowered to sue for and collect the same in any court of competent jurisdiction in this state."

On the 25th day of July, 1866, an act of Congress was approved, having the following title:    "An act granting to A. Sutro the right of way, and granting other privileges to aid in the construction of a draining and exploring tunnel to the Comstock lode, in the State of Nevada." Said last named act is as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:*    That, for the purpose of the construction of a deep draining and exploring tunnel to and beyond the 'Comstock lode,' so called, in the State of Nevada, the right of way is hereby granted to A. Sutro, his heirs and assigns, to run, construct and excavate a mining, draining and exploring tunnel; also to sink mining, working or air shafts along the line or course of said tunnel, and connecting with the same at any point which may hereafter be selected by the grantee herein, his heirs or assigns. The said tunnel shall be at least eight feet high and eight feet wide, and shall commence at some point to be selected by the grantee herein, his heirs or assigns, at the hills near Carson river, and within the boundaries of Lyon county, and extending from said initial point in a westerly direction seven miles, more or less, to and beyond said Comstock lode; and the said right of way shall extend northerly and southerly on the course of said lode, either within the same, or east or west of the same; and also on or along any other lode which may be discovered or developed by the said tunnel.

"SEC. 2.    *And be it further enacted,* That the right is hereby granted to the said A. Sutro, his heirs and assigns, to purchase, at one dollar and twenty-five cents per acre, a sufficient amount of public land near the mouth of said

tunnel for the use of the same, not exceeding two sections, and such land shall not be mineral land or in the *bona fide* possession of other persons who claim under any law of Congress at the time of the passage of this act, and all minerals existing or which shall be discovered therein are excepted from this grant; that upon filing a plat of said land the secretary of the interior shall withdraw the same from sale, and upon payment for the same a patent shall issue. And the said A. Sutro, his heirs and assigns, are hereby granted the right to purchase, at five dollars per acre, such mineral veins and lodes within two thousand feet on each side of said tunnel as shall be cut, discovered, or developed by running and constructing the same, through its entire length, with all the dips, spurs and angles of such lodes, subject, however, to the provisions of this act, and to such legislation as Congress may hereafter provide; *provided*, that the Comstock lode with its dips, spurs and angles, is excepted from this grant, and all other lodes, with their dips, spurs and angles, located within the said two thousand feet, and which are or may be, at the passage of this act, in the actual *bona fide* possession of other persons, are hereby excepted from such grant. And the lodes herein excepted, other than the Comstock lode, shall be withheld from sale by the United States; and if such lodes shall be abandoned or not worked, possessed, and held in conformity to existing mining rules, or such regulations as have been or may be prescribed by the legislature of Nevada, they shall become subject to such right of purchase by the grantee herein, his heirs or assigns.

"SEC. 3. *And be it further enacted*, That all persons, companies, or corporations owning claims or mines on said Comstock lode or any other lode drained, benefited or developed by said tunnel, shall hold their claims subject to the condition (which shall be expressed in any grant they may hereafter obtain from the United States) that they shall contribute and pay to the owners of said tunnel the same rate of charges for drainage or other benefits derived from said tunnel or its branches, as have been, or may hereafter be, named in agreement between such owners and the companies representing a majority of the estimated value of said Comstock lode at the time of the passage of this act."

Under the grants, rights, franchises, and privileges of the said legislation, the waters in controversy were brought into and through the said tunnel; and the defendants are the successors in interest to said grants, rights, franchises, and privileges. At least, evidence tending to show the foregoing facts was introduced, and they must have been so found by the trial court, and we see nothing in the record on file here to justify a disturbance of said finding.

Counsel for appellants, in their brief, say: "The testimony, without contradiction, shows that no water flows through the Sutro tunnel, except such water as is drained from the Comstock lode, or the country between its mouth and the Comstock lode, and such water as is pumped from below the level of the Sutro tunnel, and such water as is used on the Comstock lode for electrical purposes. The testimony further shows that the flow of water from the tunnel has never been uniform."

Thus it may be seen that the waters get into the tunnel from three sources: (1) Draining of the land adjacent to the tunnel; (2) pumping from the mines into the tunnel; and (3) such as were discharged into the tunnel after being used in the machinery.

The evidence further tends to show that the defendant company owns land from the mouth of the tunnel to the Carson river, over which the waters from the tunnel flow into said river.

Plaintiffs claim one-half of all the waters flowing, and also one-half of all the waters that may hereafter flow, out of and from said tunnel, to quote from brief of appellants' counsel: "(1) By appropriation and use; (2) by prescription and adverse use; (3) by acquiescence in the use of the same."

A question might arise whether the third claim mentioned does not negative and neutralize the second—whether acquiescence does not negative and neutralize prescription and adverse use.

"The user to give title must be adverse. It must be such a specific assertion of right as to expose the party to an action if as a matter of fact he had no right. It must not be in any way permissive. A license is a complete rebuttal to the presumption of an adverse user." (19 Am. & Eng. Enc. Law, 1st ed. pp. 12-15, and authorities cited in notes.)

As the record stands in this case, this point need not be further discussed.

Evidence for each of these contentions was put in by the plaintiffs, and evidence in opposition thereto was put in by the defendants. The evidence was conflicting. The district court must have found for the defendants on one or the other or both of these points. It must have found on the first point in defendants' favor, since, on the hearing of the order to defendants to show cause why they should not be enjoined and restrained from interfering with plaintiffs in their alleged right to use said waters, the court made the following order:

"It is ordered that the said order to show cause be, and the same is hereby, vacated, and the injunction applied for refused."

The evidence in the case being conflicting, this court would not be justified in reversing the case and setting aside said order; for, certainly, if the court found against the plaintiffs, on the facts involved, on all three of the contentions of plaintiffs, then no reversal could be properly had there; if on the second or third, or either of them, then, too, no reversal could be had; for, if the order of the court be right on any ground, then it should be affirmed, and this court cannot, from the record in this case, see what was the finding of the trial court on each of said contentions separately.

This would probably dispose of the case, but another and very important question was before the district court, and by it decided; and that question is now properly before this court, and we deem it proper that this court should render its decision thereon. The question is this: Are waters situated as are the waters in controversy here appropriable —that is, subject to appropriation—under the statutes and decisions of the courts of the State of Nevada? In the discussion of this question two questions arise: First—Is a stream formed of such waters a natural or an artificial and temporary stream? Second—If an artificial and temporary stream, are the waters thereof appropriable; that is, subject to appropriation?

In answer to the first question, we say we think such a stream is an artificial and temporary stream, and not a natural stream. Certainly nature did not put such waters into and

through the Sutro tunnel. The waters came therein and therethrough artificially, by means of the labor and appliances, at great expense of money and labor. We think it makes no material difference that the waters get into said tunnel from the sources above stated, to wit, percolation, pumping from the mines, and from the machinery used. When the waters get into the tunnel, they make an artificial and temporary stream.

In answer to the second question, we say we think waters situated as those above stated are not appropriable; that is, not subject to appropriation. Such waters are not like waters running in streams on the public domain of the United States. They are produced by the capital, labor and enterprise of those developing them, and by such developing they become the property of those engaged in the enterprise.

They are in the full and complete sense artificial and temporary streams. Certainly thus as to persons claiming such waters simply by using them; and there is no claim here by the government of the United States, the owners of the mines from which waters are pumped into the tunnel, or the owners of machinery by which or from which waters are passed into the tunnel. Should such claims ever be made, it could then be decided. It would be a question between those so claiming and the government of the United States, the mine owners, or the machinery owners, and the tunnel company. It cannot avail plaintiffs in this action.

How could a right to such waters be gained by appropriation and use?

Take the facts in this case. Said facts tend to show, and, the district court must have found, did show, that there were three periods in the history of said water: First, a period in which there was pumping of waters from the mines into the tunnel, and then considerable water ran from the tunnel; second, a long period of time (some eight or ten years, at least) in which there was no pumping, and then very little, if any, water ran out of or flowed from the tunnel; and, third, another period, beginning in 1899, in which there was again pumping of waters from the mines into the tunnel, and then again considerable water ran out of and flowed from the tunnel. Suppose in the first period above named plaintiffs

did use water (say, for illustration, 100 inches, being one-half of the water in the tunnel), and in the second period that the waters diminished to nothing, or next to nothing; then he had nothing, or next to nothing, for eight or ten years.

Again, suppose in 1899 1,000 inches of water came out of and flowed from the Sutro tunnel; how could his use of the 100 inches in the first period, or his use of nothing, or next to nothing, in the second period, or both of them, give him a right to the extra 900 inches of water in the third period? How could he use what was not in existence? How could he appropriate, make property of, make his own, that which did not exist? Appropriation of water means making property of it by use—making it one's own by use—and a thing cannot be used until it comes into existence. Hence, if it could be held that plaintiffs gained anything during the first or second period, that would not avail them during the third period. The best that could be claimed would be what they gained during the first or second period, and there was no attempt to show how much that was.

Again, if they gained anything during the first period, they probably lost it all during the long second period.

One further illustration: A. by artificial means fills a tank or reservoir on his own land to-day, and permits the waters to flow down to B.'s land and irrigate B.'s land. Probably A.'s conduct gives to B. the right to that water—that individual tank or reservoir full. But suppose A. fills the same tank or reservoir to-morrow, but chooses to use this water—this tank or reservoir full—to irrigate his own land; what right has B. to this last water? We think none, and it makes no material difference if such a state of things were kept up for a long number of years. In such case time would raise no presumption of a grant, and A. could at any time stop the production of such artificial and temporary stream; and he could also, at any time, if he continued the production of such stream, put the waters thereof to his own use.

The following authorities sustain and illustrate this doctrine: *Mosier* v. *Caldwell*, 7 Nev. 363; *Gould* v. *Eaton*, 111 Cal. 639; *Willow Creek Irrigation Co.* v. *Michaelson*, (Utah)

51 L. R. A. 280, and authorities cited in note (s. c. 60 Pac. 943); Kin. Irr. p. 474, sec. 297; Id. p. 478, sec. 298; Gould, Waters, 2d ed. p. 445, sec. 225; Id. p. 537, sec. 279; Id. p. 634, sec. 352; Id. p. 62, sec. 34; Id. sec. 280; *Crescent Min. Co.* v. *Silver King Min. Co.*, (Utah) 54 Pac. 244; *Arkwright* v. *Gell*, 5 Mess. & W. 203; *Greatrex* v. *Hayward*, 8 Exch. 291; *Hargrave* v. *Cook*, (Cal.) 41 Pac. 18–20; *Railroad Co.* v. *Dufour*, (Cal.) 30 Pac. 783; *Hanson* v. *McCue*, 42 Cal. 307, 10 Am. Rep. 299; *Barnes* v. *Sabron*, 10 Nev. 217; Godd. Easem. pp. 243, 247.

The order of the district court vacating the order to show cause and refusing an injunction is affirmed.

*Per Curiam:*

Rehearing denied.