## RIGGS OIL COMPANY v. GRAY

(No. 1808; March 13, 1934; 30 Pac. (2d) 145)

The cause was submitted for the plaintiff and appellant on the brief of *Raymond and Diefenderfer* of Newcastle, Wyoming.

No brief was filed for defendant and respondent.

RINER, Justice.

This case brings a judgment of the District Court of Weston County for review by direct appeal. The facts material to be considered, and in connection with which the present litigation arose appear to be these:

The State of Wyoming, through its Board of Land Commissioners, on August 2, 1927, granted to one Clinton W. Smith, a "Lease of State Land" on Section 16, Township 46 North, Range 64 West, in Weston County, Wyoming. This lease ran for the term of five years from the date thereof, i. e., "until and including the first day of August, A. D. 1932." The instrument, among other provisions, contained the following, "The lease holder or tenantry right leased and let by this lease, is for grazing purposes"; "Reservations by the State Board of Land Commissioners. * * * (b) The right to lease and dispose of all minerals, metals, coal and timber within and upon said premises, together with sufficient surface rights and rights of way upon and through said premises for conducting the necessary work for developing and prospecting of minerals, metals or coal in said premises, or the cutting and removal of timber thereon"; and "no assignment or sub-lease made by the second party will be recognized by the first party unless it shall have been entered upon the records of the Commissioner of Public Lands and approved by the State Board of Land Commissioners." Smith, without the State Board's approval, thereafter orally leased this land to one Henry Martens, and the latter used it for

the purpose of grazing his own cattle thereon, Martens reimbursing Smith for the rental due the State, under the terms of the lease.

On February 2, 1931, the State of Wyoming, through its Board of Land Commissioners, aforesaid, issued to one Herbert B. Fowler, an "Oil and Gas Prospector's Lease" covering the above described property, for the period of one year from and after its date. By this instrument, there was granted to the said Fowler "the exclusive right to prospect said land for OIL AND GAS during the term of this lease, together with such surface rights as may be actually required for roads, pipe lines, telephones, storage, housing and drilling operations." It also provided that "in the event of a commercial discovery of Oil and-or Gas in the land hereby leased the lessee will within thirty (30) days after making such discovery surrender this lease and apply for an Oil and Gas Operating lease."

Thereafter, an arrangement was consummated whereby one A. J. Riggs was employed to "enter into a contract with a reliable well drilling contractor for the drilling and completion of a well for oil upon the said premises." This Riggs did through the plaintiff and appellant, the Riggs Oil Company, a New Jersey corporation, of which he was the accredited agent, by contracting with the defendant and respondent, Duff O. Gray, for that purpose. Under the instrument last mentioned, acknowledged by both parties July 7, 1931, Gray agreed to drill a well for oil upon the property, aforesaid, as provided by the terms of the contract, at such location on the South half of the Northeast quarter of said Section 16, as the Riggs Oil Company might select.

The well was, in due course, drilled by Gray as agreed, and completed about October 28, 1931, oil in

commercial quantities being discovered therein. Gray's work in connection with the drilling operations appears to have been satisfactory, and he received the agreed compensation therefor.

During the course of putting down the well, Gray informed Riggs in substance that he intended to erect a dam across a draw situated a short distance off the South half of the Northeast quarter of said section, but however, located on the remaining portion thereof, for the purpose of creating a catch basin for surface waters to aid in drilling operations and, thereby, to avoid hauling the necessary water therefor. Under the terms of the contract between Riggs and Gray, the latter was to furnish the water needed for his operations. Riggs responded that "that would be fine if he got water." Gray, accordingly, with the assistance of Martens, put in the dam, it being orally agreed between them that Martens should have the right to water his cattle at the reservoir thus made, if he so desired. The well was duly completed and Gray paid for his work in drilling the well pursuant to contract, as heretofore stated, but no water in the meantime had accumulated in the reservoir, as there was no precipitation in the form of either rain or snow. Subsequently, and from December, 1931, onward, water gradually began to be impounded in the reservoir, as the snows and rainfall made their contributions thereto.

On January 2, 1932, the State of Wyoming, through its Board of Land Commissioners, granted to

Herbert B. Fowler an "Oil and Gas Operating Lease" on all of said Section 16 for the term of ten years, with certain preferential rights as to the future. Under this instrument, he was given the "exclusive right and privilege to drill for, mine, extract and remove all of the oil and gas deposits" in or under said land "together with the right to construct and maintain thereon all works, buildings, plants, waterways, roads, telegraph or telephone lines, pipe lines, reservoirs, tanks, pumping stations, or other structures necessary to the full enjoyment thereof." On March 9, 1932, Fowler assigned an undivided one-fourth interest in this operating lease to each of the three associates, and on June 8, 1932, all four of these parties assigned all of their interest in the South half of the Northeast quarter of said Section 16, to the Riggs Oil Company, these assignments each being made with the consent and approval of the Board of Land Commissioners of the State.

Sometime in February, 1932, Riggs, on behalf of the Riggs Oil Company, secured from Fowler and his associates, under the State Oil and Gas Operating lease, aforesaid, the right to use the water which was being impounded by the dam erected, as above described, the same to be employed in the oil producing operations of that company on that part of said Section 16 in which it was interested. Later and during the spring of the year last mentioned, Gray also went to Fowler and asked for Fowler's written permission to use the water aforesaid. This was refused, Fowler, however, saying to Gray that he could have all water out of the pond that Gray wanted, "after Mr. Riggs' needs were taken care of."

Subsequently, and under date of May 30, 1932, Gray and Martens executed a written instrument which, after reciting the previous oral arrangement between

these parties concerning the dam, aforesaid, then provided:

"that D. O. Gray shall repair said dam and maintain the same and for such service shall have the right to the exclusion of all others to the water stored in said dam except and reserving to said Henry P. Martens the water rights for his cattle as above stated and now existing. D. O. Gray further agrees that in the event he should derive profit from the disposal of any of said water he will pay the said Henry P. Martens the percentage of such profit verbally agreed upon."

The Riggs Oil Company, about June 10, 1932, let a contract for the drilling of another well on the South half of the Northeast quarter of said Section 16, and Gray was an unsuccessful bidder for this work. Thereupon, the latter went to Riggs and forbade him to use any of the water held by the dam construction previously described, unless Riggs paid Gray $100 per month for such use. This Riggs declined to do, and proceeded to install a short two inch pipe line from the impounded water to the boiler used in the Riggs Oil Company's operations on the land. About July 2, 1932, Gray came on the property and tore out the connections thus made, telling Riggs that if they were put back he, Gray, would return and take them out again.

The Riggs Oil Company caused the connections with the water to be made once more, brought suit for an injunction to restrain Gray from further interfering with the impounded water and the connections installed, and procured and had served on Gray a temporary order thus restraining him. The latter filed his answer asserting a right to the water in controversy because of his construction of the dam and his agreements with Martens hereinabove described. Plaintiff filed its reply consisting in the main of gen-

eral denials, and containing some new matter. The case was tried to the court with the result that the temporary restraining order was dissolved, and the action dismissed at plaintiff's costs.

No appearance has been made in this court and no brief has been filed on behalf of the defendant and respondent

So far as we can gather from this record, the judgment attacked is grounded upon an affirmance of the claim of respondent, as set forth in his answer. The appellant asserts that the judgment is contrary to law and unsupported by the evidence. A careful survey of the facts in the case, in the light of the legal principles we deem controlling, leads us to think that this is so.

It is perfectly apparent that the water in dispute was surface water only and, as such, possessing the status indicated by the authorities as follows:

In 2 Kinney on Irrigation and Water Rights (2d Ed.) 1145-6, § 654, it is said:

"Surface water, or diffused surface water as it is sometimes called, we have defined as water on the surface of the ground, the source of which is so temporary or limited as not to be able to maintain for any considerable time a stream or body of water having a well-defined and substantial existence. No permanent right to the appropriation of this water can be maintained from the fact that its movements are too erratic and capricious. Formed as it is from the rainfall or the melting snow upon the ground, or from the natural drainage from the lands above, no absolute right, by means of an appropriation as that term is understood in the arid region, can attach while it still remains surface water.   *   *   *.

"Surface water, however, may be captured and impounded in any method available by a land owner over whose lands such waters have flowed, and, when so captured, it becomes the absolute property

of such land owner and is not subject to appropriation by others."

See, also, Hunt v. City of Laramie, 26 Wyo. 160, 169, 181 Pac. 137.

The author, in III Farnham, Waters and Water Rights 2572, § 883, referring to surface water, says:

"The owner of the soil on which it falls has an absolute right to it, and may do with it what he pleases."

And Mr. Gould, in his treatise on Waters (3d Ed.) 538, § 265, remarks:

"According to the rule of the common law, which is accepted in England, Massachusetts, Maine, Vermont, New York, New Hampshire, Rhode Island, New Jersey, Michigan, Minnesota, Wisconsin, Washington, New Mexico, Texas, etc., a land-owner may appropriate to his own use or expel from his land all mere surface water or superficially percolating waters."

Under the State leases mentioned above, the only parties entitled to use the surface of Section 16 here involved—and, hence, the surface waters thereon—were the mineral lessee Fowler and those claiming through him, and the grazing lessee Smith. We shall arbitrarily assume, however, for the purposes of this case, that Martens, under his oral arrangement with Smith, had rights equal to those of the latter, touching the surface uses of said section. But it is evident that the paramount right to the use of the surface of this land, so far as operations necessary for the production of minerals, drilling, and reservoir construction in connection therewith were concerned, was reserved under the terms of the several leases given by the State, as above described, to the mineral lessee.

When Gray assumed to enter into a contract with

Martens and placed the dam on the land covered by these leases, what was done pursuant to that arrangement was merely accomplished through the acquiescence of the mineral lessee. The construction work was, of course, undertaken in aid of Gray's drilling operations for the mineral lessee. As it turned out, through drought, the work helped him not at all. He did it, simply taking his chance that it might. When Gray completed his drilling contract in the fall of 1931, his rights upon the land or concerning it were completely terminated. Martens at no time had power to agree, to the detriment of the mineral lessee, that Gray should have the right to the use of the impounded surface waters on this land. Hence, it follows that the mineral lessee had the right to grant the Riggs Oil Company the use of this impounded water, and Gray possessed no right whatsoever to interfere with that use.

In I High on Injunctions (4th Ed.) § 702a, upon the authority of a number of cases, the text states that:

"it is held that where the acts of trespass are constantly recurring but the injury resulting from each separate act is trifling, so that the damages recoverable for each act would be very small when compared with the expense necessary to prosecute separate actions at law therefor, relief will be granted owing to the inadequacy of the legal remedy."

In Pohlman v. Evangelical Lutheran Trinity Church, 60 Nebr. 364, 83 N. W. 201, the following language was used:

"It is argued that injunction will not lie, as plaintiff had a complete remedy at law to recover damages. It was shown that defendants tore down and destroyed the fence, and threatened to continue doing so as often as plaintiff should restore

the same. This threatened continued trespass was sufficient to give a court of equity cognizance of the cause, though the defendants may not be insolvent. Shaffer v. Stull, 32 Nebr. 94."

Accordingly, we conclude that the temporary restraining order should not have been dissolved, and the plaintiff's action should not have been dismissed without affording it relief. The judgment of the district court of Weston county must be reversed, with instructions to grant a permanent injunction restraining the defendant and respondent from in any manner interfering with the equipment of the plaintiff connecting with the impounded water, or in any manner interfering with said reservoir.

*Reversed with instructions.*

KIMBALL, C. J., and BLUME, J., concur.