## STATE v. HIBER, ET AL.

(No. 1865; May 8, 1935; 44 Pac. (2d) 1005)

For the appellant, there was a brief by *Ray E. Lee,* Attorney General; *O. O. Natwick,* Deputy Attorney General, and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne, and oral argument by *Mr. Snow.*

For the respondents there was a brief by *Alvin T. Clark* and *Burt Griggs*, of Buffalo, and oral argument by *Mr. Griggs*.

BLUME, Justice.

This action was brought by the State to prevent the defendants from impounding water on certain lands in Johnson County, Wyoming. All of the defendants except Frank Hiber filed a disclaimer of interest and Frank Hiber will hereinafter be generally referred to as the defendant. The petition alleges that the defendant owns the SE¼ of Section 27, T. 46 N., R. 79; that one T. H. Adamson is the owner of the SW¼ of Section 35 in the same township and range; that Adamson Draw runs through the land of the defendant and of

T. H. Adamson in a northwesterly and southeasterly direction; that Adamson Draw is a natural stream, and T. H. Adamson received a permit from the State Engineer of Wyoming to construct on his land, by damming the draw, a reservoir and to thereby impound the waters running therein; that Adamson has partially constructed such reservoir; that the defendant, however, has constructed a reservoir on his lands (about a mile above that of Adamson) for the purpose of impounding the waters of the draw; that he has no permit whatever from the State Engineer to do so; that his dam is approximately 200 feet in length, with a maximum height of thirteen feet; that it "is an unlawful and illegal construction by which waters belonging to the State of Wyoming are collected and stored and used * * * without lawful right, license or permit thereto and that said structure should be abated and defendants * * * restrained and enjoined from collecting the water flowing through said Adamson Draw in its natural state and from interfering with the natural flow of said Adamson Draw." Plaintiff's prayer is as follows:

"Wherefore plaintiff prays that the defendants and each of them be enjoined from using said dam for the purpose of collecting the water flowing in said Adamson Draw in its natural state or otherwise unlawfully interfering with the natural flow of said Adamson Draw and for such other and further relief in the premises as to the court may seem just and proper."

The defendant Hiber set up various defenses. He admits that he is the owner of the land as mentioned in plaintiff's petition and of other lands in Section 27 in the same township and range; that the Adamson Draw runs through his land; that it is a swale and depression collecting water from melting snows and excessive rains; that it is ordinarily entirely dry, without any source of water supply whatever; and that it

is not now and never has been a natural stream; that it has no natural banks or channel; that the soil along the draw above the reservoir constructed by T. H. Adamson is extremely porous and gravelly and that even if he, the defendant, did not impound the water sometimes running in Adamson Draw, it would never reach the reservoir constructed by Adamson; that the water impounded by him is necessary for watering live stock, and that it is the custom of the country to construct reservoirs such as his without any permit from the State Engineer of the State. The State in its reply denied all affirmative allegations. It was stipulated and agreed that the defendant has no permit from the State of Wyoming to construct any reservoir upon his land, and it was shown that T. H. Adamson has a permit to construct one upon his land. It was issued on March 29, 1930. A reservoir was partially constructed soon thereafter. It is situated about a mile southeasterly from that constructed by Hiber. Adamson's reservoir was constructed first.

We deem it best to give a summary of the evidence bearing on the question as to whether or not Adamson Draw referred to in the pleadings is a natural stream. The testimony in brief is about as follows:

That of the witness Morrow for the State discloses: "Q. Is this a deep ravine or is it shallow, where the water flows? A. It is a well defined drainage. Q. That is, there is a course marked on the ground where that has been worn by the water? A. Oh yes, it is a draw, possibly fifteen to twenty feet lower than the surrounding country. * * * There is no creek bed, or anything of the kind. It is grassed over. Q. Do you know whether Adamson Draw has any permanent source of water supply? A. I don't know whether it has or not, but I don't believe it has. * * * Came from snow and rain." The witness Adamson, the same person who had a permit from the State to build a reservoir on his

land, stated as follows: "Q. Will you explain the flow of water in Adamson Draw? A. I can't tell you what the flow is. * * * I believe the most water comes when the snow is melting in the spring. There is a well defined water course. The land slopes generally to this draw for 80 rods to half a mile either side of it. The highest elevation is possibly 200-300 feet above the water course as it narrows down to this stream. I would say the stream bed was about 15 to 20 feet wide and in places three or four or five feet deep. There is a well defined channel above the Hiber dam * * * I saw a flowing stream in the draw last May. When the snow melted; the water came from the snow. Do not know how long it ran. There is no permanent source of water supply in this draw." The witness Eder stated that "there is a decidedly natural water course at Adamson Draw," but testified to no details. The testimony on behalf of defendant is substantially as follows: The witness Bradley, a mail carrier since the summer of 1930, and constantly carrying mail since that time, stated that the mail route crosses Adamson Draw about one-half mile above the Adamson reservoir; that the draw is "just a swale"; there is no culvert or box to carry off the water; he had crossed it 300 times and constantly; he had never seen any flowing water in it, and there is no stream in it; the bottom is well grassed; there are no well defined banks nor is there a creek channel; it is just a small water drainage for rain water, and snow water. The witness Glenn Mocabee, a neighbor of the defendant, has lived there five or six years. He described the draw as a "drainage"; "there is no water in the main drain. All the water falls on the slopes and the bottom of the drain is grassy." If stock were kept off, hay could be mowed on most of it. He never saw a stream in it; only rain and snow drains into it. It has no well defined banks or channel and shows no washing. The

drainage area is about 300 acres. Reservoirs, such as that of defendant, are built all over the country; they are necessary for stock purposes. The witness H. H. Paxton, too, is a close neighbor of defendant. He has known the draw in question for about ten years; it is grassed over, has no permanent source of water supply, and he had never seen any water flowing in it. It is in no sense a stream; only rain and snow drains into it. The witness Eklund, also defendant's neighbor, had known the draw for nine years and had crossed it on the average twice a week. "It isn't," he stated, "really a draw; it is just a swale. The country is rolling and just slopes in from both sides." It is just a swale or depression; it has no permanent source of water supply; only snow and rain drains into it; its watershed is about 300 acres; it extends about forty rods beyond the north line of defendant's land; all but a small part of the watershed is on defendant's land; the hills are easily made by a car on high. The swale can be crossed at most any point with a car; there are no banks or drop-off. He crossed it the morning of the trial with a load. The witness Kinzer stated that he had known the draw for seventeen years, during a number of which he lived in the neighborhood thereof, and is thoroughly familiar with the draw. "It is just a swale; grass and sage brush at its lower point. There are hills around it. It has no well defined banks or creek channel; it has no permanent source of water supply, only rain and snow drains into it; its watershed is about 300 acres, mostly located on defendant's land. The soil is gravelly and the water would never reach Adamson's reservoir." The witness Willy, also a neighbor, testified that there were not even patches in the draw devoid of grass, and no water ever washed the draw bare at any place.

1. Under Section 1, Article 8 of the Constitution of the state, "the waters of all natural streams, springs,

lakes or other collections of still water within the boundaries of the state * * * are declared to be the property of the state." The legislature, even if it could lawfully do so, has not attempted to go beyond the terms of the constitution, and has made no provision for the appropriation of waters other than those mentioned in the Constitution, for it is said in Section 122-401, Wyo. Rev. St. 1931, that "a water right is a right to use the water of the state," and applications for permit, and permits, for the appropriation of water relate to, and are, by Sec. 122-401, confined, to "public waters of the state of Wyoming." See Hunt v. City of Laramie, 26 Wyo. 160, 181 Pac. 137. Nor does the state make a contrary contention herein. Its theory is that Adamson Draw is a natural stream; that defendant has no permit to appropriate any waters therefrom, and that, accordingly, he has no right to impound the waters running therein. The controlling question, accordingly, is as to whether or not the assertion that the draw is a natural stream is correct. Counsel for the state contend that in an arid region the term "natural stream," should be construed liberally. So much we may, for the purposes of this case, concede. But it is further contended that "the proper test of distinction, according to the rule laid down * * * as to what constitutes a natural stream or water course is whether or not the water is in such shape as to make it susceptible to application for beneficial use." The test proposed does not seem to be justified by any authorities, even by Popham v. Holloron, 84 Mont. 442, 275 Pac. 1099, which was decided under a statute not at all like ours, and which in its facts differs materially from those in the case at bar. The test is out of harmony with Hunt v. City of Laramie, supra, in which it was held that percolating water developed artificially by excavations or other means belong to the owner of the land upon which they are developed and cannot be

appropriated as waters of the state. It is further inconsistent with Riggs Oil Co. v. Gray, 46 Wyo. 504, 30 P. (2d) 145, in which we held that surface waters belong to the owner of the land on which they are found and may be captured and impounded by him. To apply the test proposed by counsel for the state would require us to overrule the two cases just cited. Nothing has been shown in the case at bar, nor has any argument been advanced by counsel for the state, to convince us that, for the best interests of the people of the state, or for other reasons, we ought to do so.

If, then, the water in question here was surface water, or what comes to the same thing, if it was not the water of a natural stream, the court was right in finding for the defendant, as to his right to impound it. As to whether it is the one or the other in a specific case is not always easy to determine, and is generally, or often, a question of fact. Tierney v. Yakima County, 136 Wash. 481, 239 Pac. 248; Farnham, Waters and Water Rights, Secs. 455 and 878; Kinney on Irrigation (2nd Ed.), Sec. 318. Surface water, it has been said, is that which is diffused over the surface of the ground, derived from falling rains and melting snows, and continues to be such, and may be impounded by the owner of the land, until it reaches some well defined channel in which it is accustomed to, and does, flow with other waters; or until it reaches some permanent lake or pond, and it then ceases to be surface water and becomes the water of the water course, or a lake or a pond, as the case may be. Kinney on Irrigation, supra, Sec. 318; Crawford v. Rambo, 44 Ohio St. 279, 7 N. E. 429; King v. Chamberlain, 20 Idaho 504, 118 Pac. 1099. This, accordingly, brings us directly to the point as to whether or not the waters in controversy reached such definite channel—in other words, whether Adamson Draw was a natural stream or water course.

Such questions have given the courts much trouble. Farnham, supra, Sec. 455. Many, if not the greater number, of cases on the subject have arisen in connection with drainage. By the civil law, adopted on this particular point by a number of states, the lower owner must suffer surface water to descend upon his land from that situated above him, and he has no right to make any obstruction to prevent it. On the other hand, the owner of the upper land cannot by artificial trenches or otherwise cause the natural mode of its being discharged to be changed to the injury of the lower field. Washburn, Easements, 450. Other states have followed the rule of the common law that surface water is the common enemy of mankind, and the owner either of the upper or lower field has a right to divert it, by obstruction or otherwise, as he wishes. Wiel, Water Rights in the Western States (3rd Ed.), Sec. 348. These rights, however, cannot be exercised against another in any of the jurisdictions, if the water is not surface water, but the water of a natural stream. Hence have arisen the cases involving the question as to whether particular water was of the one kind or the other. As in Nevada, so in this state, it is seldom that any land-owner has occasion to complain of too much water. "The cry is, usually, not for less, but for more." Boynton v. Longley, 19 Nev. 69, 6 Pac. 437, 3 A. S. R. 781. Yet, generally speaking, so far as can be perceived, the problem as to what constitutes a natural stream has not been treated in the arid regions differently than in the states further east, where the doctrine of appropriation does not apply. And that with good reason, for the fundamental problem of ownership of land, and the incidents thereof, cannot be far different in one region from that in another. The fact that water in the arid regions is necessary for irrigation or domestic use is no reason in itself why the owner of land should be deprived of all rights

in connection therewith, for when the benefit accruing from appropriation is offset by the detriment to another, the public welfare is not, in the absence of other circumstances, thereby increased. Hence we are permitted to pursue inquiry into our subject by consultation of authorities in any jurisdiction.

It is said by Kinney, supra, Sec. 303, that "according to the great weight of authority, the essential characteristics of a water course are: A channel, consisting of a well-defined bed and banks, and a current of water." Some exceptions have been made, the definition has not been applied in all cases, and it may be difficult to give one that is universally applicable. United States v. Ide, (C. C. A.) 277 Fed. 373. Too much stress ought not, perhaps, to be placed upon any one of the elements mentioned, and all should be given due consideration. Farnham, supra, Sec. 455. However, the definition given has been approved in recent cases. Turner v. Oil Co., (Tex. Civ. App.) 62 S. W. (2d) 491; Maricopa County etc. v. Cotton Co., 39 Ariz. 65, 4 P. (2d) 369; Tompkins v. Brown, 134 Kans. 119, 4 P. (2d) 454; Motl v. Boyd, (Tex.) 286 S. W. 458; Boone v. Wilson, 125 Ark. 364, 188 S. W. 1160; Le Munyon v. Ry. Co., 60 Mont. 517, 199 Pac. 915; Grand Rapids etc Ry. Co. v. Round, 220 Mich. 475, 190 N. W. 248; Evanville etc Ry. Co. v. Scott, 67 Ind. App. 121, 114 N. E. 649. In Hutchinson v. Watson Slough D. Co., 16 Idaho 484, 101 Pac. 1059, 133 A. S. R. 125, which involved appropriation of water, the court held that "a water course is a stream of water flowing in a definite channel, having a bed and sides or banks, and discharging itself into some other stream or body of water. The flow need not be constant, but must be more than mere surface drainage occasioned by extraordinary causes; there must be substantial indications of the existence of a stream which is ordinarily a moving body of water." In Simmons v. Winters, 21 Ore.

35, 27 Pac. 7, 28 A. S. R. 727, also involving appropriation of water, the Oregon court, after citing and quoting from a number of decisions, finally stated:

"The conclusion to be deduced from these decisions is that a water-course is a stream of water usually flowing in a particular direction, with well-defined banks and channels, but that the water need not flow continuously—the channel may sometimes be dry; that the term 'water-course' does not include water descending from the hills, down the hollows and ravines, without any definite channel, only in times of rain and melting snow; but that where water, owing to the hilly or mountainous configuration of the country, accumulates in large quantities from rain and melting snow, and at regular seasons descends through long deep gullies or ravines upon the lands below, and in its onward flow carves out a distinct and well-defined channel, which even to the casual glance bears the unmistakable impress of the frequent action of running water, and through which it has flowed from time immemorial, such a stream is to be considered a watercourse, and to be governed by the same rules."

Courts of other western states have taken the same view; that of Arizona in Maricopa County etc. v. Cotton, supra; that of Montana in LeMunyon v. Ry. Co., supra; that of California in Lux v. Hagin, 69 Cal. 255, 4 Pac. 919, 10 Pac. 674, 769; that of Washington in Tierney v. Yakima County, 136 Wash. 481, 239 Pac. 248. Kinney, supra, Sec. 302, says that "a water course does not include surface water conveyed from higher to lower levels for limited periods, during the melting of snow, or during or soon after a heavy fall of rain, through hollows or ravines, which at all other portions of the year are entirely dry. These occasional bursts of water, which in times of freshets, or of melting ice or snow, descend from the hills and inundate the country, have none of the characteristics of a water course." The water, as already indicated, need not run through the entire year. 67 C. J. 681. On that subject Kinney,

supra, says in Sec. 307 that "those who are acquainted with the streams and water courses of the arid Rocky Mountain region of this country, draining as they do steep, mountain areas with their swift currents,. running over gravelly and rocky bottoms, know that often in a dry summer month many of them are entirely dry, at least upon the surface. All of them, nevertheless, have well defined bed, channels, banks and currents of water, at least the greater portion of the year." Again, it is said that a water course does not include the water flowing in the hollows or ravines in land, which is mere surface water from rain or melting snow (i. e., snow lying and melting on the land) and is discharged through them from a higher to a lower level, but which at other times are destitute of water; that such hollows or ravines are not, in legal contemplation, water courses. Los Angeles Cemetery Ass'n. v. City of Los Angeles, 103 Cal. 466, 37 Pac. 375; Sanguinetti v. Pock, 136 Cal. 466, 69 Pac. 98; Kinney, supra, Sec. 312. And, it has been stated that "it is almost the unanimous doctrine that swales are not, in their strict legal sense, water courses." Kinney, supra, Sec. 314. Farnham, supra, Sec. 457, maintains that the source of water which flows in a channel claimed to be a water course is a more satisfactory test than is the presence or absence of a channel. But even he holds that there must be more than surface water, unless it comes from a large area of country, and is so continuous in its flow that it takes upon itself the character of a water course. So it is said in 27 R. C. L. 1064 that a "water course is the condition created by a stream of water having a well defined and substantial existence, and that if this substantial existence is present the fact that the stream is not strong enough to create for itself bed and banks is not sufficient to defeat its character as a water course." Hinkle v. Avery, 88 Iowa 47, 55 N. W. 77; 45 A. S. R. 224,

and Miller v. Canal etc. Co., 155 Cal. 59, 99 Pac. 502, 22 L. R. A. (N. S.) 391 are cited. In the Iowa case the water in question came from a spring, running continuously, at times in a well defined channel with banks, at times spreading out several rods, later again coming together again in a narrow, well defined and single channel, with the current visible along the entire course. Here the substantial existence of the stream could not be questioned, and the case presents a feature altogether absent in the case at bar. In the California case it was held that where a stream flows in a continuous current, the fact that the water thereof, on account of the level character of the lands, spreads over a large area, without apparent banks, does not affect its character as a water course; the overflow caused by ordinary rain fall is but a part thereof. Other cases, cited in note to 1 L. R. A. (N. S.) 757, are of a similar character, and have no application in the case at bar. See in this connection Miller v. Ry. & Lumber Co., 84 Wash. 31, 146 Pac. 171. So while too strict adherence to the definition that, to constitute a water course, there must be a stream flowing in a bed with banks, has at times given trouble, that definition is, ordinarily, correct and sufficient. Note, 1 L. R. A. (N. S.) 757.

In the case of Gibbs v. Williams, 25 Kans. 214, the court said:

"Again, for a water-course there must be a channel, a bed to the stream, and not merely low land or a depression in the prairie over which water flows. It matters not what the width or depth may be, a water-course implies a distinct channel, a way cut and kept open by running water, a passage whose appearance, different from that of the adjacent land, discloses to every eye on a mere casual glance the bed of a constant or frequent stream."

And the court, commenting upon the evidence in that case, made the following remarks, some of which are very appropriate in the case at bar:

"It is very clear from the evidence that this depression lacked these essential features of a water-course. Along its bottom the grass grew as elsewhere; a little coarser and thicker, perhaps, but with that as the only difference. Mowing machines were run in it. The turf was not cut through and a distinct channel worn in the soil by the running water. Doubtless any one looking at it in connection with the surrounding land, and noticing its lower level, would perceive that it was a passage-way for surface-water, but one examining it disconnected from its surroundings would not instantaneously perceive that it was a water-course,—that it was a channel cut and kept open by frequent flow of water."

This case was approved and quoted from in C. K. & N. Ry. Co. v. Steck, 51 Kans. 737, 33 Pac. 601, and Evans v. Diehl, 102 Kans. 728, 172 Pac. 17. And in Hinkle v. Avery, supra, the Iowa court, commenting on Gibbs v. Williams, supra, stated that, in view of the facts of that case, the language used therein was "apt, and its correctness would not be doubted."

Testing the facts in this case by these rules of law, we think we must hold that there was ample testimony to sustain the finding and judgment of the trial court, and that the state has failed, at least by a preponderance of the evidence, to show that Adamson Draw is a natural stream. According to most, if not all, of the evidence, it is dry nearly all the time, the main exception being in the spring. It is covered with grass; it has no banks; it is easily crossed by a vehicle almost everywhere; its main course is confined to the lands of the defendant. Its commencement is but a short distance beyond the north boundary thereof, and it has not been shown that it extends southward to a great length; at least, so far as the evidence shows it has no

natural outlet. The run of the water therein is confined to a short period in the spring time when the snows melt; or heavy rains at other times may cause it to run for a short period of time. It is even doubtful, by reason of the porous soil, that any water would in any event reach the defendant's reservoir. Judging from the testimony, no one would instantaneously perceive that it is a water course. It is, of course, marked on the ground, as all draws are, but that it has been worn out by the water, in view of its grassy condition and the absence of banks, is not very likely, even though the testimony of the witness Morrow might, in answer to a double and leading question put to him, be understood to the contrary. The watershed is small; at least half of it, if not more, is confined to the lands of the defendant, and it would seem that the case may be said to resolve itself into the question as to whether or not the defendant has the right to impound water coming from melting snows and heavy rains, which fall onto his lands and on a small adjoining area, and which drain into a depression on defendant's lands. We think he has that right under the circumstances disclosed herein, or, at least, the trial court had the right to so find.

2. The state contends that, in any event, however, the dam erected by the defendant is a public nuisance, and as such should have been abated, inasmuch as it is more than ten feet high in violation of Section 122-1401, Rev. St. 1931, which provides that:

"Duplicate plans for any dam across the channel of a running stream, above five feet in height, or of any other dam intended to retain water above ten feet in height, shall be submitted to the state engineer for his approval, and it shall be unlawful to construct such dam until the plans have been approved."

We may concede that if the dam is in fact more than ten feet high, it could, in so far as it constituted a

nuisance, be abated. Big Horn Power Co. v. State, 23 Wyo. 271, 148 Pac. 1110. It is doubtful that the state intended to raise this point when the action was commenced. The petition was, apparently, drawn on the theory that Adamson Draw is a natural stream, and that hence the defendant has no right to impound its waters without a permit. Nothing in the petition suggests, at least upon first reading, that the state asked any relief in case it should be found that Adamson Draw was not a natural stream. It did not ask that the dam should be lowered so as to comply with the law. However that may be, the evidence submitted as to the height of the dam is conflicting, and we think that the court was warranted in finding that it is not more than ten feet high. Moreover, the point is of minor importance. We can see no justice in insisting that the whole of the dam be torn down, if it in fact is somewhat higher than the law allows. If, as it stands, it is in fact a nuisance, it is such, if not constructed across a natural stream, only to the extent that it is above ten feet high and no further. The right to abate a nuisance must be reasonably exercised. It is limited to the removal of only so much of the objectionable thing as actually causes the nuisance. The infliction of any unnecessary injury is not justified. 46 C. J. 757, 759; Gould on Waters (3rd Ed.), Sec. 364.

The judgment of the trial court should, accordingly, be affirmed, and it is so ordered.

*Affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.