# BINNING v. MILLER, WATER DIVISION SUPERINTENDENT (BAYER ET AL., INTERVENERS)

(No. 2126; April 29, 1940; 102 Pac. (2d) 54)

(Opinion No. 1)

452

454

For the appellant, there was a brief and oral argument by *J. A. Greenwood* of Cheyenne.

For the respondents, there was a brief by *T. S. Talia-ferro, Jr.* and *A. L. Taliaferro* of Rock Springs, and oral argument by *T. S. Taliaferro, Jr.*

BLUME, Justice.

This action was originally brought by Burleigh Binning, hereinafter mentioned by his name or as plaintiff, against David P. Miller, water superintendent of Water Division No. 4 of this state, which includes Sublette County, in which the property hereinafter mentioned is situated. The action was brought to enjoin the water superintendent from interfering with a certain dam along so-called Spring Gulch Creek, prevent him from shutting down the headgates to plaintiff's ditches, and to compel him to regulate the water coming out of Willow Lake Reservoir in favor of the plaintiff. Charles J. Bayer and William Bayer intervened. Miller agreed in the case to abide by the judgment of the court. The real controversy is between the plaintiff and interveners, and no further reference need be made to Miller, as defendant. The case developed into two independent actions, one relating to the dam along Spring Gulch Creek and matters incident thereto, in which Charles J. Bayer is interested, and the other relating to Willow Lake Reservoir and matters incident thereto. The present opinion, named No. 1, will dispose of the controversy between plaintiff and Charles J. Bayer in reference to Spring Gulch Creek, leaving the controversy as to Willow Lake Reservoir for a separate opinion this day filed.

In 1906 one George M. Glover erected a headgate for a ditch on what was then a swale, to conduct water for 77 acres of land onto the E-½ of the E-½ of Section 12, T. 34, R. 109, which is herein at times referred to as the Glover land. He took what he stated on his map accompanying his petition to be waste and seepage water in the swale, running north-easterly. This water

came from the so-called Binning lands—lands of the plaintiff which are located in a northeasterly direction from the lands of Glover. The Glover land is now, and since 1929 has been, owned by the intervener Charles J. Bayer, who will ordinarily be referred to as intervener. The appropriation allowed Glover in 1906 by the Board of Control was actually one out of Willow Creek in accordance with the application filed by him. Willow Creek runs north and south on the west portion of the Glover land. On November 12, 1936, the Board of Control made, ex parte, what is termed a correction of the adjudicated right, giving the source of the right what is therein termed Spring Gulch Creek, the course of which will hereafter be traced, but embracing what has above been termed a swale. The SE-¼ of Section 6, township and range aforesaid, corners with the Glover land. It is now owned by the plaintiff Binning. The swale above mentioned ran through that land. In 1936, before the Board of Control made the so-called correction, the plaintiff undertook to construct a dam across the swale (or stream) on his own land, near the southwest corner of Section 6, constructing it of a height which prevented any water from going down the swale (or stream) to the headgate of intervener, and turning the water by a more direct westerly route toward Willow Creek. He erected this dam, he claims, so as not to damage the Glover land by flooding it, and also for the purpose of conveying some of the water to a tract of land, about 100 acres, owned by him, which has no water right. The intervener complained, and David P. Miller, the water superintendent, was called in. He, on July 1, 1936, ordered the plaintiff to remove the dam, threatening to close down plaintiff's headgates in case of failure to do so. The plaintiff appealed from that order to the state engineer, who by order of October 5th, 1936, modified the order of the water superintendent, and directed the plaintiff to construct a

suitable outlet in the dam so as to permit sufficient water to escape to satisfy the appropriation for the Glover land. The plaintiff, refusing to abide by the order of the State Engineer, brought this action on December 19, 1936, to enjoin the water superintendent from closing his headgates and from interfering with plaintiff in the maintenance of the dam. Charles J. Bayer, the intervener, alleged that the appropriation made by Glover in 1906 was from Spring Gulch Creek, a tributary of Willow Creek; that he had used the right for many years; that the erection of the dam by plaintiff was unlawful, damaging the intervener in the sum of five thousand dollars. The trial court found that "Spring Gulch Creek is a natural water course"; that the appropriation was actually from that creek instead of from Willow Creek; that the intervener was damaged in the sum of $616, and that the erection of the dam was unlawful in so far as it prevents the intervener from getting his water. The court ordered judgment accordingly, and from that judgment the plaintiff Binning has appealed.

The facts in this case require that the situation and condition of the place from which Glover made his appropriation in 1906 should be distinguished from the situation and condition existing at the time of the trial. The court did not make that distinction and merely found that the so-called Spring Gulch Creek, from which the appropriation was made *is* a natural stream, so that we have no finding before us as to what the situation was in 1906. But the main question, or at least one of the main questions, is as to whether or not Glover made an appropriation in 1906 from a natural stream, so as to give rise to the damages which the intervener claims herein.

The original application of George M. Glover for a permit to appropriate water for his land is in the record. It shows that the source of water is from

Willow Creek. It is, however, stated that the headgate of his ditch is located S. 31° W. 410 feet from the Northeast corner of Sec. 12, T. 3, R. 110. That shows that the appropriation was not in fact from Willow Creek, but from a swale or depression, now called a natural stream, running from the Binning lands onto the Glover land. Glover was a witness in the case and explained the facts. He testified that he commenced to make an appropriation out of Willow Creek; that after he had constructed part of the ditch, he found that he was trying to run water up-hill, abandoned that attempt and took "waste water" from the "Binning meadows." He filed with his application a map, which is in the record before us, showing his headgate and a draw into the Binning meadows, along which is written "waste and seepage water." This fact, particularly in the light of Glover's testimony, points unerringly to the truth of what kind of water he appropriated. Counsel for the intervener seem to have missed the force of the written evidence before us. Maps are required to accompany applications for the appropriation of water (Sec. 122-411, Rev. St. 1931), and the statement therein contained is equivalent to a direct statement in the application that the applicant wanted to appropriate waste water from the Binning meadows. Water running in a natural stream is not waste or seepage water, even though it may have been such previously. State ex rel. v. District Court, 102 Mont. 533; 59 P. (2d) 71. The terms "natural stream" and "waste and seepage water" are contradictory of each other. The use of one excludes the other. The possibility is scarcely conceivable that a man who is appropriating water from a natural stream would state that he is appropriating waste and seepage water from some meadows. Assuming that parol testimony was admissible to contradict the written evidence in the record before us, such evidence to show the latter to be false

should at least be clear and convincing. But we find no such convincing evidence. On the contrary, nearly all the evidence in the case corroborates the written testimony. Little discrepancies here and there are not of substantial weight. It should not be necessary, particularly in view of what we have said, to set out the corroborating testimony in detail. A summary should suffice. That is as follows:

What is, or was in the early day at least, properly called Spring Gulch Creek, originates in the NW-¼ of Section 29, T. 35, R. 110. Its source is one or more springs. It runs in a southwesterly direction for approximately one fourth mile southwest of Binning's corral, and then disappears. Its total length does not exceed ¾ mile. The amount of water flowing therein is small, approximately one-half cu. ft. p. s. t., and in any event not exceeding one cubic foot, and which, according to all the testimony, does not reach the lands of the intervener. The lands between the point where the stream disappears and the lands of the intervener, being mainly in Section 31, T. 35, and Section 6, T. 34, R. 110, belong to the plaintiff Binning. The distance between these points is approximately two miles or possibly a little more. The Binning lands slope toward the center, thus making a draw or low place which continues on to Willow Creek. During the first decade of this century the land was covered with sagebrush, gradually cleared in the course of years. No regular channel of a stream and no banks were visible, and it could be readily crossed everywhere by a team and wagon. And that is the situation now except where the draw or swale approaches the Glover land. Even David P. Miller, witness for the intervener, testified that no channel and no banks of a stream are visible for a mile and a half from the place where Spring Gulch Creek proper disappears, but that a stream exists "in the extreme lower part." He did not see the country until

1934, although he expressed the opinion that "that channel was there before any white man came to this country." Just where the draw, swale or depression running through the Binning meadows starts is not clear. Two different maps are in evidence, differing on that point, although, of course, they should not, since they supposedly should represent physical facts. One of the maps, prepared by a civil engineer, introduced by the plaintiff, clearly shows that there is no connection whatever between Spring Gulch Creek proper and the draw or swale on the Binning meadows near the Glover land. It does not appear who prepared the other map, introduced by the intervener, nor is it shown that it is correct. It shows Spring Gulch Creek to be a continuous stream from its origin to Willow Creek. Binning commenced to clear his land about 1899 or 1900, and gradually increased the area which he irrigated, thus gradually increasing the amount of seepage water from his lands. The foregoing general facts were testified to by the witnesses Thomas Orcutt, John L. Alllen, Martin Williams, Fred W. Miller, Edgard Cantlin, Sadie Hall and others, most of whom lived in the neighborhood of the lands here in question during the early part of this century. Even the intervener himself testified that in the early day, Spring Gulch Creek was not, and was not considered a continuous stream, corroborating the statement above mentioned as to what was considered Spring Gulch Creek proper. And while the record is not quite clear at one place, he did not, apparently, even as late as 1934, consider Spring Gulch Creek as a tributary of Willow Creek.

Counsel for the intervener relies much on the testimony of Nels Jorgenson. He testified as follows:

"Q. When is the first time, in your knowledge, that you saw water running down that stream? A. The spring of 1899. Q. Tell the court where that water was

at the time you saw it. A. It was running through the Glover field. Q. Where does it empty? A. It empties into Willow Creek. Q. How much water, if you know, did you see? A. I didn't measure it, but guessing at it, I should think there would be between four and six cubic feet. Q. Do you know what time of the year that was? A. Yes, that was in the spring. At that time I had just moved up on my place in that winter, and I was riding for livestock quite frequently in 1899, 1900 and 1901. Q. Did you see water running at any time except in 1899? A. Yes, I saw it, I think, in 1900 and 1901. Q. Was it running all the way to Willow Creek then? A. Yes, in the spring, or sometime in the latter part of June or the first part of July."

This witness was the only one who claimed to have seen any water of any great quantity in the draw. That testimony is confined to 1899. It is indefinite as to the other years. He did not state for how long he saw the water running. Nor did he testify that the draw had any banks of any kind indicating the existence of a stream, and the undisputed testimony shows that there were none.

Counsel for intervener also point to the fact that Mrs. Binning, in 1912, made an appropriation of water from what we have called Spring Gulch Creek proper, and seem to think that this fact shows that a natural stream existed through the Binning meadows. But that is not so. The water disappears, and does not reach the intervener's land. While it was perfectly proper for Mrs. Binning to appropriate the water, it could not be of any use to the intervener, and hence could not be appropriated by him. Ide v. U. S., 263 U. S. 497, 44 Sup. Ct. 182, 68 L. Ed. 407; Fourzan v. Curtis, 43 Ariz. 140, 29 P. (2d) 722, 724. Counsel also call attention to the statement of the witness Miller that "that channel existed before any white man came to the country." But that statement is of no significance. The draw or depression or low place was there, of course. Water must escape. It runs in the low places.

That does not show that the low place constituted a natural stream any more than the depression or swale which was fully discussed in the case of State v. Hiber, 48 Wyo. 172, 44 P. (2d) 1005. It is not very likely, as already stated, in fact almost incredible, that if Glover in 1906 had found a running stream—running even for a portion of the year—with a channel carrying four cubic feet of water, as mentioned by the witness Jorgenson, that he would have sought to appropriate merely waste and seepage water. He knew the difference between that kind of water and a natural stream, for he first sought to appropriate water out of Willow Creek, which was in fact a natural stream. We think it is clear that Glover did not appropriate water in 1906 from a natural stream, but that he sought to appropriate seepage and waste water, and we must proceed to consider whether he had a right to do so.

In a number of states, including Colorado, Oregon, Idaho, Montana, Nebraska, seepage and waste water may be appropriated, under certain limitations, the statutes ordinarily giving the first right to the owner of the land on which such water originates. See Wiel, Water Rights (3rd ed.) Sec. 55. We have no such statute, and hence cases which hold that such water may be appropriated must be accepted in this state with caution. We are governed by our constitution and our statutes. Section 1 of Article 8 of the Constitution provides that "the water of all natural streams, springs, lakes or other collections of still water, within the boundaries of the state, are hereby declared to be the property of the state." Section 122-401, Rev. St. 1931, provides that "a water right is a right to use the water of the state," and applications for a permit for the appropriation of water are, under section 122-404, confined to "public waters of the state." If, then, we do not give any strained construction to these provisions, it would seem to be clear that only water in nat-

ural streams, springs or lakes are subject to appropriation. In Hunt v. City of Laramie we held that percolating water developed artificially by excavations is not subject to appropriation. We held that to be true of surface waters in Riggs Oil Co. v. Gray, 46 Wyo. 504, 30 P. (2d) 145, and we held it to be true also of water of spring rain and snows which gathered in a draw, readily crossed, as was the draw in the case at bar, but which did not form a natural stream. State v. Hiber, supra. In the case of King v. Chamberlin, 20 Ida. 504, 118 Pac. 1099, the court stated among other things: "Section 3, article 15 of the constitution, is dealing with the water of a natural stream and provides among other things as follows: 'The right to divert and appropriate the unappropriated waters of any natural stream to beneficial use shall never be denied' etc. Section 3253 of the Rev. Codes, which provides for making applications to the state engineer for permits to appropriate water has reference to 'public waters' and 'the waters of a natural stream, springs or seepage water, or lakes or other public waters.' Neither the statute nor the constitution ever contemplated authorizing one man to appropriate and divert the property of another. Both the constitution and statute were dealing with *public unappropriated* waters of the state as distinguished from private property." In Public Utilities Comm. v. Natatorium Co., 36 Ida. 287, 211 Pac. 533, it was held that no water except public waters can be appropriated; that percolating water is not public water. One of the justices stated that "I am not willing to subscribe to the theory that all waters within the borders of the state, which are found where nature places them, are public waters of the state, the property of the state, and solely under the control of the state wherever found. To carry this doctrine to its logical conclusion, the owner of the fee who sinks a well upon his premises and discovers water has but a

qualified ownership." Another justice, referring to the constitution of Idaho, states that "considering article 15 and the above statutes, I conclude that the ownership of water by the state, and the resulting right of appropriation are confined to the waters of natural streams, either surface or subterranean, and do not extend to subterranean springs or percolating water situated entirely on privately owned land and not flowing in a natural channel." In Skinner v. Silver, 158 Or. 81, 75 P. (2d) 21, the court, after referring to the statute of that state permitting appropriation of seepage water, stated among other things that "the water from these springs and the seepage water on the land (in controversy) do not form a running stream or natural water course, but are more in the nature of surface water * * *. The waters with which we are concerned are not public waters, and no one has the right to file for the same excepting the owner of the land." In Brewster v. Water User's Ass'n., 27 Ariz. 23, 229 Pac. 929, 934, the court stated that "drainage waters are not of the class specified by the statute as subject to appropriation. The waters involved in this litigation were put into the ground by means of artificial irrigation. They are not naturally in the ground and a part of it, in the sense of coming from a source unknown. They are not, therefore, subject to appropriation under any of the provisions of the statutory law." In Wedgworth v. Wedgworth, 20 Ariz. 518, 181 Pac. 952, 954, the court stated that "surplus water is not subject to prior appropriation for any use so that any property right is established by such appropriation and use. 'Surplus water' must be understood as water running off from ground which has been irrigated; water not consumed by the process of irrigation." In Hagerman v. Drainage District, 25 New Mex. 49, 187 Pac. 555, the court stated among other things that "from the authorities cited, it will be seen

that only natural waters flowing in stream and watercourses are subject to appropriation; that the creator of an artificial flow of water is the owner of the water so long as it is confined to his property, but that when such artificial waters are deposited in a natural stream and the creator of the flow has lost his dominion over the same, such waters become a part of the waters of the stream, and are subject to appropriation and use, but it is only after such waters reach the stream that they are subject to appropriation and use." Similar in effect are Willow Creek Irr. Co. v. Michaelson, 21 Utah 248, 60 Pac. 948, 51 L. R. A. 280; Cardelli v. Comstock Tunnel, 26 Nev. 284, 66 Pac. 950; Terry v. Heppner, 59 S. D. 317, 239 N. W. 759; Watson v. United States, 260 Fed. 506; 67 C. J. 969. In Vanderwork v. Hawes, 15 N. M. 569, 110 Pac. 567, the court held that the state engineer had no right to allow an application for the appropriation of percolating water. Each of these cases, it is true, involved a contest in which the owner of the land from which the percolating water was sought to be taken objected because of the use which he intended to make of it, and we have looked for cases in which such use was not possible or was limited, but we have found none. But the authorities seem to agree that the lower owner using such water merely takes his chances that the supply will be kept up; that he has no right thereto, no matter how long he may have used it. Kinney, Irrigation (3rd ed.) Sections 661, 1208; Wiel, supra, Sections 55-59. In Garns v. Rollins, 41 Utah 260, 125 Pac. 867, the court stated that "the law is well settled, in fact the authorities all agree, that one landowner receiving waste water which flows, seeps or percolates from the land of another cannot acquire a prescriptive right to such water, nor any right (except by grant) to have the owner of the land from which he obtains the water continue the flow." These cases consider seepage and waste water as pri-

vate water so long as it is on the lands from which it originates, and that seems to be correct. And they, accordingly, are agreed that, in the absence of a statute, such water cannot be appropriated, and we do not think that, in view of the fact that many appropriators in this state depend on return water, we can lay down a contrary rule. We might mention in that connection that Glover and intervener could not, constructively, be considered an appropriator of the water of Willow Creek, for the reason, if no other, that he could not obtain from the creek the seepage water here involved, because it would flow into Willow Creek, if let alone, even below the point of diversion from which Glover tried to get the water from Willow Creek onto his land, and found that he could not do so.

So we shall proceed to consider what rights Binning had to this water, and consider his claims why he deprived the intervener of the use thereof. He gives two reasons for constructing the dam across the draw or gulch or stream in question. He asserts that water cannot be applied in irrigation in such a manner as to result in increasing the drainage water flowing onto the lands of a neighbor; that the intervener had complained of this and that the dam was partially constructed for that reason. We do not think that it is necessary to investigate the law of drainage of irrigating water. It does not materially aid in the solution of the ultimate question before us. He further relies upon the rule already stated that the user of waste water cannot require that the flow thereof continue. It is true that according to the common law, percolating water, including waste and seepage water, is part of the soil. Some authorities go so far as to hold that the owner of the soil may sell such water and do with it what he pleases. A full discussion of the subject is found in 2 Kinney, supra, Section 661; Long, Irrigation (2nd ed.) Sec. 89; Wiel, Water Rights (3rd ed.) Secs.

55-59; 67 C. J. 834-842; Note 89 A. L. R. 213. And it may be conceded, though the present rule in Colorado seems to be doubtful, that the general rule is still that seepage water belongs to the owner absolutely, so long, at least, as he can make beneficial use of it on the land for which it was appropriated. 67 C. J. 838-839; Stevens v. Irrigation District (Cal.) 90 P. (2d) 58; 91 P. (2d) 105; Ide v. United States, 263 U. S. 495, 44 Sup. Ct. 182, 68 L. Ed. 407; Burkardt v. Meiberg, 37 Colo. 187, 86 Pac. 98; see Nevius v. Smith, 86 Colo. 178, 279 Pac. 44. The common law rule, however, has been modified in many states. 67 C. J. 838-839; Kinney, supra, Sections 1185-1211; Wiel, supra, section 1119 et seq. Beneficial use has been the measure of a water right in this state since 1888 (Ch. 55, Sec. 14, L. 1888), and is in other states. And so it is held in a number of cases that seepage water which, if not intercepted, would naturally reach the stream, is just as much a part of the stream as the waters of any tributaries and must be permitted to return thereto, if the owner cannot make beneficial use thereof. Rock Creek Ditch Co. v. Miller, 93 Mont. 248, 17 P. (2d) 1074, and note thereto in 89 A. L. R. 218-227; 67 C. J. 1006, 1015. That would seem to be the more reasonable rule in irrigating states. Binning does not claim that he can use the waste and seepage water in question upon the land for which the water was appropriated, but wants to use it on land, about 100 acres in extent, which is adjoining. But whether or not under our system of appropriation he should be permitted to do that, without an application for a permit therefor, is a doubtful question. The point has not been well presented, and we do not want to decide it until it is necessary. We do not think it is. There is testimony that the seepage water is of sufficient volume to let the intervener have his water and still permit Binning to irrigate the 100 acres mentioned. So we shall base our ultimate conclu-

sion in this case upon the theory that Binning has no right to the 1.1 cubic feet of water p. s. t. which the intervener has been using.

We find ourselves, then, in a situation where the intervener acquired no right to the waste and seepage water in question by reason of the appropriation made by Glover, and where plaintiff, too, had no right thereto. But if Binning had no right to the water why should he have interfered? Why should he not have been required to keep his hands off and respond in damages for failure to do so? If we had the wisdom of Solomon we might be able to find a way in which to answer the latter question in the affirmative. As it is, we are confronted with conditions, and are acquainted only with rules of law, which require a negative answer. These are as follows:

(a)  In view of our law relating to priority of right by virtue of appropriation, and in view of the fact that appropriators often depend on return water, we could in no event say that the intervener had any right to the water in this case, unless we knew definitely that appropriators further down the stream were not injured or did not object, and the only definite way in which we could know would be by bringing them into the case. We could not afford to lay down a rule which might compel a great number of appropriators to seek to come into a case or bring an independent action in order to determine the right to use seepage water. And there is a serious question whether we could afford to lay down a rule which would compel a great number of appropriators to come into a case and defend against a claim to use seepage water. It is probably safer, for the benefit of all, and for the sake of stability of water rights, to declare definitely that an appropriation of seepage water is void. Of course, if a party has once obtained possession of such water, and another party not entitled thereto should attempt to deprive him

thereof, the possessor would doubtless have a cause of action. Wiel, supra, Sec. 55. But that is not the situation here. The intervener wanted to get possession, and sues because Binning prevented him from getting it.

(b) Duty and right are correlative. If we should hold that it was Binning's duty to let the intervener have the water, we should thereby declare that the intervener had a right thereto. We have already seen that he had no legal right. If he had any right thereto at all, it would be what would be called a natural right. But we search in vain through the annals of law, where such natural right has been held to exist, at least where, as in this state, an appropriation of water must be made in a prescribed manner. Ignoring subsequent appropriators, the water would be in the nature of fugitive water. If two hunters try to shoot down wild birds, the unsuccessful one cannot complain. If one of them gets more than he needs, and more than he can use, it would be a neighborly act to invite the other to the feast. But the rules of morals, while impenetrating, are not co-extensive with the rules of law. If a purse is lost in a street, the finder has the right of possession, except against the owner, and no one except the latter has any right to interfere. But if two parties see the purse at the same time, neither of them has a cause of action against the other because possession was first taken by one of them. So in this case, if the water may be considered lost or abandoned, and Binning took it first, the intervener cannot complain, unless he can show that he has a legal right thereto. If Binning had permitted the intervener to pick up a lost purse each year for the last 35 years, that would give the latter no right to complain that this year Binning himself picked it up. It cannot be said that the same purse is in controversy. The water is always different from year to year. Moreover, if a purse were lost in

Binning's house, it is a serious question whether the intervener would have a right to pick it up at all. The water in this case is found on Binning's premises.

(c) A rule runs throughout the law that he who sues for damages or for interference must show that a legal right had been invaded. Thus it is stated in Kinney on Irrigation (2d ed.) Sec. 1640, that "In an action to enjoin the defendant from diverting water or to prevent him from a continuous invasion of any of the plaintiff's rights, it devolves upon the plaintiff, in the first instance, to establish a prima facie case to his right to the use of the water or other right in question, as set forth in his complaint." In Gianulakis v. Sharp, 71 Utah 528, 267 Pac. 1017, 1019, the court stated that "before the plaintiff in this suit can complain because he has been deprived of the use of the water flowing from the springs in question, he must establish some right to the use of such water or a part thereof. Even though it be conceded that defendant's title is weak, that fact alone does not entitle plaintiff to any relief." To the same or similar effect are Tucker v. Light and Water Co., 77 Mont. 91, 250 Pac. 11, 15; Legatt v. Carroll, 30 Mont. 384, 76 Pac. 805; 67 C. J. 805-806; Wiel on Water Rights (3rd ed.) Sec. 636; Long, Irrigation, (2nd ed.) Sec. 270, and cases cited by these authorities. We find, accordingly, that the intervener cannot claim any damages by reason of being deprived of water under the Glover appropriation.

However, that is not all of the case. We have already stated that the situation in 1906 must be differentiated from the conditions in 1936. David P. Miller testified that at that time Spring Gulch Creek in the "extreme lower part of section 6 has very definite channels and banks and so forth." That is on Binning's land. The witness Glasgow, who was a witness for Binning, testified: "Q. Doesn't it (the so-called Spring Gulch Creek) or not, develop into a stream that is visible?

A. Yes, at the lower end it develops into a stream, where this dam is." It appears that the trial judge examined the ground. Some photographs in the record show quite a stream near the dam erected by Binning, but we cannot tell whether that is partially or wholly produced by the dam. We presume that the court did not take the artificial condition, if such, into consideration, as it should not have been, recent as it was. While we should have been more satisfied, if it had been more clearly shown how long the condition testified to by the above mentioned witnesses existed, yet taking all the facts into consideration, including the fact that seepage commenced at least 30 years previous to 1936, we are not, we think, justified in holding that the finding of the trial court is wrong that Spring Gulch Creek *is* a natural stream, in so far as the lower end of the swale or draw in question is concerned where the claim of the intervener Charles J. Bayer originates, and that we must distinguish the existing situation from that which existed in 1906 when Glover made his appropriation. The continued seepage from Binning's lands seems during the course of years to have finally made a regular, natural stream of water near the Glover land. In Popham v. Holloran, 84 Mont. 442, 275 Pac. 1099, the court stated that "where such waters did not originally collect and flow down the channel, if through the instrumentality of man they have been made to do so, and through years of so flowing have acquired a permanent character as the natural drainage of the watershed, the original manner of the creation of the stream is immaterial; it is a 'watercourse' with all the attributes of one wholly natural." In City of Reading v. Althouse, 93 Pa. St. 400, the court among other things stated: "And so in Sutclife v. Booth, 32 L. L. Q. B. 136 it was held, per Wightman, J., that a watercourse, though artificial, may have been originally made under such circumstances, and have been so used

as to give all the rights that the riparian proprietors would have had, had it been a natural stream. Of like import is the case of Nittall v. Branwell, Law Rep. 2 Exch. 1, in which Channel, B., says 'I see no reason why the law applicable to ordinary running streams, should not be applicable to such a stream as this, for it is a natural flow or stream of water, though flowing in an artificial channel.' " See also San Gabriel etc. Club v. Los Angeles County, 182 Cal. 392, 188 Pac. 554, 9 A. L. R. 1200; Willis v. Morris, 100 Mont. 514, 50 P. (2d) 862-870-871. While we are not altogether satisfied on the point, we think we should hold that the water running in the stream was, commencing at least with 1936, subject to appropriation.

The Board of Control of this state granted the intervener a right out of Spring Gulch Creek on November 12, 1936. It appears from the certificate of appropriation that an affidavit had been filed, to the effect that the original grant of water, while stating that it is out of Willow Creek, should have stated it to be out of Spring Gulch Creek. The correction was made as asked, dating the appropriation back, of course, as of 1906. We see no good reason why we should interfere with the order of the Board of Control any further than necessary. We think, accordingly, that the certificate of appropriation above mentioned should be permitted to stand, subject to the conditions herein contemplated. And the judgment of the trial court, too, should stand, in so far as it directs that the dam erected by Binning as above mentioned should be so kept as to give the intervener Charles J. Bayer 1.1 cubic feet of water per second of time out of the waste and seepage water which gathers naturally near the above mentioned dam, and near the line between the lands of Binning and the intervener. In view of the uncertainty of the future, the right of the intervener should be made subject to the usual rights of landowners, namely, the

right of Binning and his successors in interest to use the water above mentioned for beneficial purposes upon the land for which the seepage water was appropriated, should such beneficial purpose be possible. And the right of the intervener should, as above indicated, not be construed to interfere with the appropriation made in 1912 out of what has herein been called Spring Gulch Creek proper. As so modified the judgment of the trial court, in so far as the water right is concerned, is affirmed. The proceedings of the Board of Control in issuing the certificate of appropriation on November 12, 1936, as above stated, were ex parte. And while the litigation in this case may be said to serve as a substitute for the ordinary procedure before the Board of Control so far as the right to the water in question is concerned, yet it is clear that no rights as against Binning should be held to be acquired at least until Binning received definite notice thereof. See Lincoln Land Co. v. Davis, 27 Fed. Supp. 1006. The pleadings of intervener herein did not inform Binning of the existence of the certificate of appropriation above mentioned. It does not appear that he had definite, clear knowledge thereof until the trial of this case in September, 1937. The damages herein awarded were for depriving the intervener of water in the years 1935, 1936, 1937. That award and judgment must, accordingly, be set aside. It is so ordered.

*In part reversed, in part modified and affirmed.*

RINER, Ch. J., and KIMBALL, J., concur.