MIDKIFF, Respondent v. KINCHELOE, Appellant.

No. 9118.

Submitted March 24, 1953. Decided June 26, 1953. Dissenting Opinion December 9, 1953. As Amended on Denial of Rehearing, December 15, 1953

263 Pac. (2d) 976.

Mr. Chief Justice Adair dissented.

Farr & Colgrove, Miles City, for appellant.

W. B. Leavitt, Miles City, F. F. Haynes, Forsyth, for respondent.

Mr. R. V. Colgrove and Mr. Leavitt argued orally.

MR. JUSTICE ANGSTMAN:

Plaintiff owns land in Rosebud county requiring artificial irrigation. He has used the land since 1916 as a livestock ranch. He contends that he is entitled to the water of Home creek which runs through his ranch but which is a dry creek except that it flows from the spring runoff of melting snows and when the rainfall is sufficient. His contention is that he has used the waters of the creek since 1916 by a system of levees or dikes for the irrigation of 80 acres. Defendant in June 1949 built a dam across the creek above the point where it enters plaintiff's land, the result of which is to impound some of the water in a reservoir depriving plaintiff of the use thereof. This action was to establish plaintiff's right to the use of the water and to enjoin defendant's interference therewith.

The court found in favor of plaintiff and that he was entitled to the water of Home creek for the irrigation of 80 acres of land and ordered that defendant install a headgate at the bottom of his dam to consist of a pipe 30 inches in diameter or other aperture of equivalent size, or to open the dam.

Defendant has appealed from the judgment.

The court's findings, which were made after a view of the premises, may be summarized as follows: That plaintiff has owned the land comprising his ranch since 1916 which among other lands includes 80 acres of meadow or hay land, and that

the entire farm is operated as a single farm unit in the ranching and livestock business; that the land is arid in character, requiring artificial irrigation for the production of hay; that Home creek flowing from east to west crosses plaintiff's land; that water flows in the creek only in the spring of the year as a result of fast melting snows and at other times when the rainfall is sufficient; that creek originates about 6 miles east of plaintiff's land and after crossing his land flows into the Musselshell river about four miles west of his land; that defendant operates a ranch about one mile east of plaintiff's land; that neither party or their predecessors in interest filed a water right appropriation as permitted by statute; that in 1916 plaintiff began the construction of a system of dikes or dams on Home creek as it enters his 80 acres of meadow land; that each dike when completed would spread the water onto the land above the dike to the approximate depth of one foot; that the water after reaching the approximate depth of one foot would then escape in runways at each end of the dike or through openings or pipes placed in the center of the dike and thence flow down the creek until it reached the next dike where similar action would take place, irrigating the land between that dike and the one above it; that there were seventeen of these dikes constructed or commenced between 1916 and the time this action was started in August 1949; that some of the dikes along the west end of plaintiff's project were completed after the action was commenced, but most of them were constructed and the water diverted and put to a beneficial use prior to the construction of defendant's dam and reservoir; that some of the original dikes were repaired or enlarged from time to time by plaintiff in the use of his water right; that defendant's dam was constructed in June 1949 about a mile and a half above plaintiff's land; that it was constructed with a spillway so that it would hold in storage four acre-feet of water before the water would flow over the spillway; that defendant's dam provided water for watering livestock only; that the dam obstructs and interferes with water to which plaintiff is entitled.

As conclusions of law the court found that plaintiff has a prior and superior right to the water of Home creek for the irrigation of his 80 acres of meadow land; that defendant is a subsequent appropriator and that he did not sustain the burden of proving that his dam does not interfere with plaintiff's prior right; that defendant should be required to install a headgate sufficient in size to let the water through to which plaintiff is entitled, and permit defendant to "impound or gather the flow of said water in Home creek only when such action will not prevent the plaintiff from receiving or reducing his receipt of the water to which he is entitled." The court fixed the size of the circular pipe at 30 inches in diameter or any other aperture of equivalent size which the evidence shows would be sufficient to deliver 80 acre-feet of water in 24 hours.

The principal contention of defendant is that the court erred in its finding as follows: "That while some of the dikes along the west end of plaintiff's project were completed after the filing of this action, most of them were constructed and the water diverted put to a beneficial use by the plaintiff prior to the construction of defendant's dam and reservoir."

It is conceded defendant constructed his dam in June 1949. Some of plaintiff's dikes were not constructed until the fall of 1949. On cross-examination plaintiff testified that four of his dikes were constructed after August 1949. Eight of the others were either worked on, completed or extended in length after defendant's dam was completed. Witnesses for defendant gave practically this same version of the facts.

Plaintiff in rebuttal testified that only three new dikes were constructed in 1949, but he did not state at what time in 1949 they were constructed. It must be regarded as established that at least three of his dikes were constructed after defendant's dam was built. Several others were enlarged, repaired or completed after defendant's dam was completed.

Plaintiff testified that from his first dike constructed in 1916 he irrigated five or six acres. At some time he used brush dams to raise the water level. He increased the size of his project

from year to year. In explaining what he meant by completing a dike in 1949 he meant extensions or repair work and not a new system. He said dikes had existed there before, but they were enlarged or repaired.

As before noted neither party to this action filed the statutory ▉ notice of appropriation and hence neither party is entitled to benefit from the doctrine of relation back which is a doctrine that may be relied on only by one who has complied with the statute. R. C. M. 1947, sec. 89-812.

Defendant takes the view that since plaintiff had not completed his entire irrigation project until after defendant had completed his stock water dam he acquired no prior right.

With this we do not agree. Certainly to the extent that ▉ plaintiff's project had been completed before defendant's dam was constructed plaintiff had a prior right. The rule is that he who first diverts the water to a beneficial use has the prior right thereto where the right is based upon the custom and practice of the early settlers as here, and where there was no compliance with the statute. Murray v. Tingley, 20 Mont. 260, 50 Pac. 723; Bailey v. Tintinger, 45 Mont. 154, 122 Pac. 575; Clausen v. Armington, 123 Mont. 1, 212 Pac. (2d) 440.

It is unquestioned that plaintiff had completed many of his ▉ dikes and diverted water to much of his 80 acres before defendant's dam was constructed. To the extent that plaintiff had made use of the water before defendant's dam was constructed plaintiff had the prior right. The only purpose, however, of extending some of plaintiff's dikes as shown by the evidence was to spread the water over more of his land. Likewise the building of new dikes was to spread the water over more land, or to increase the amount of water used over the land between the new dike and the one immediately above it.

The record shows that some water was used by plaintiff on the extreme west end of his ranch before the dikes were built in that area, but the building of the dikes increased the amount of water that would be spread over the land above it and between the new dike and the one immediately above it. To

the extent that plaintiff increased the amount of water that he put to a beneficial use after defendant's dam was constructed, his rights are inferior to those of defendant. On the record before us we cannot determine how much additional acreage plaintiff irrigated as a result of the extension or enlargement of his dikes or the building of new dikes after defendant's dam was constructed, nor can we determine how much additional water was applied to a beneficial use by plaintiff as a result of the enlargement or extension of his project after defendant's dam was completed.

It is our opinion that additional evidence should be received bearing upon those features of the case and appropriate order made in that connection. The court properly held that defendant has a right to capture and retain whatever water he needs whenever plaintiff's rights have first been satisfied. This is nothing more than permitting defendant to capture water that would otherwise be wasted. We think, however, that instead of a pipe being placed at the bottom of defendant's dam, the flow of the water should be controlled by flash boards or other device to the end that defendant may capture and retain in his reservoir whatever water may flow in the stream at a given time in excess of the rights and needs of plaintiff.

The cause is remanded for further proceedings in accordance with the views herein stated.

MR. JUSTICES BOTTOMLY, FREEBOURN and ANDERSON, concur.

MR. CHIEF JUSTICE ADAIR: dissenting.

The defendant Wade Kincheloe owns and operates a cattle ranch comprising 3,000 acres of deeded and leased lands in the northwest part of Rosebud County, Montana.

The plaintiff J. L. Midkiff owns and operates a cattle ranch comprising 5,366 acres of deeded and leased lands in the same locality and drainage area, the plaintiff's lands being im-

mediately to the west of and at a lower elevation than defendant's property.

A dry gully or arroyo called Home Creek that commences on a height or uplift of land located approximately one mile and a quarter from the town of Sumatra descends therefrom in a generally westerly direction through open and rolling prairie country, passing through various ranches including those of both Kincheloe and Midkiff, the latter being a lower land owner.

The gully has no springs,—no living streams as tributaries and no permanent source of water supply. Such water as flows in the gully at any time comes directly from either melting snows or heavy rains that have fallen upon the surface of the lands of Kincheloe and others lying within the drainage area of the gully.

The drainage area from which waters could find their way into the below described Kincheloe reservoir all lies to the east and above the easterly boundary of the Midkiff lands and comprises but 12,800 acres including the lands of Kincheloe, but excluding the lands of Midkiff and all lower land owners.

During the months of June and July 1949, Wade Kincheloe, at considerable expense of time, labor and money, constructed a livestock reservoir having a natural and efficient spillway by building, on land entirely owned by him (Kincheloe), a carefully constructed and efficient earth dam across the above described dry gully, such dam being located about a mile and a half above or easterly from Midkiff's east boundary line fence and above the lands and holdings of Midkiff.

Using zero as the deepest part of the reservoir the westerly end of the dam measures 11.5 feet in height. The completed reservoir has a total maximum storage capacity of 181,000 cubic feet of water which, according to the expert testimony adduced at the trial, would be equivalent to about 4 acre-feet of water.

During the time that Kincheloe was constructing his livestock water reservoir as well as subsequent to its completion, Midkiff was busily engaged in constructing a series of additional dikes across the gully for the purpose of spreading and diffusing water

on more of his (Midkiff's) lands than such water as flowed in the gully from time to time would otherwise reach.

On August 29, 1949, Midkiff as plaintiff commenced this suit against Kincheloe as defendant. Therein he sought to have the district court of Rosebud County order the defendant Kincheloe to remove his dam,—to issue an injunction permanently enjoining Kincheloe from interfering with the flow of any water in the gully and to adjudge that the plaintiff Midkiff has a first and prior right to the use of all the waters in and carried by such gully.

The right to appropriate water is a statutory right, originating in local customs and sanctioned by early legislation upheld in the courts. With these customs and legislative regulations the plaintiff Midkiff has not complied.

In this jurisdiction dedication of waters to the public for the purpose of laying the legal foundation for their appropriation and use under state regulation is made by constitutional provision.

The Constitution of Montana, Art. III, sec. 15, provides: "The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution, or other beneficial use, and the right of way over the lands of others, for all ditches, drains, flumes, canals, and aqueducts, necessarily used in connection therewith, *as well as the sites for reservoirs necessary for collecting and storing the same,* shall be held to be a public use. * * *" Emphasis supplied.

R. C. M. 1947, sec. 89-801, provides: "*What waters may be appropriated.* The right to the use of the unappropriated water of any river, stream, ravine, coulee, spring, lake, or other natural source of supply may be acquired by appropriation, and *an appropriator may impound flood,* seepage, *and waste waters in a reservoir and thereby appropriate the same.*" Emphasis supplied.

This statute authorizes the appropriation of flood, seepage, and waste waters. The appropriation so authorized may be ac-

complished by impounding such waters "in a reservoir". Sec. 89-801, supra.

The plaintiff Midkiff has no reservoir capable of capturing, storing and impounding the waters of the gully. All he has is a series of low dikes built across the gully which temporarily deflect, retard, spread and diffuse already diffused waters all of which, either as snow or rain, have first fallen upon the lands of Kincheloe and other upper land owners and none of which originally fell upon the lands of Midkiff.

To the extent that waters conform to the classification of flood, seepage or waste waters they may be impounded and thereby appropriated under R. C. M. 1947, sec. 89-801, supra. However, the defendant Kincheloe has the same right to impound, store and put to beneficial use these flood and waste waters while they are upon his lands as has the plaintiff Midkiff when they reach his holdings.

In Newton v. Weiler, 87 Mont. 164, 179, 286 Pac. 133, 139, the plaintiff, a lower land owner having made a valid appropriation of waste water, sought to compel the defendant, an upper land owner, to allow waste waters to flow to the lower lands. This court there said: "Defendant, as the proprietor of his land, has the right to use his land as he pleases, and has the right to change the flow of the waste waters thereon in the reasonable enjoyment of his own property, subject to the limitation embraced in the maxim ' "Sic utere tuo ut alienum non laedas," or as is said in some of the cases, the use must be without malice or negligence,' Ryan v. Quinlan, 45 Mont. 521, 124 Pac. 512, 516."

In the Newton case, supra, diversion ditches were used. Here the plaintiff admits that he had no diversion ditch or ditches but only low dikes built across the gully which has been widened, filled in and spread out by a bulldozer.

In Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 268, 17 Pac. (2d) 1074, 1080, 89 A. L. R. 200, this court said that "the owner of the right to use the water—his private property while in his possession—may collect it, recapture it, before it

leaves his possession, but, after it gets beyond his control it thus becomes waste and is subject to appropriation by another.''

It is the general rule that diffused surface waters resulting directly from rain and melting snow may be collected, impounded and put to a reasonable beneficial use by the owner of the land on which they occur, so long as such waters remain on such owner's land. In the event the landowner makes a reasonable use of waters resulting from rain and melting snow, and particularly of such as result from precipitation on his own land, such waters may be treated as ''flood, seepage, and waste water'' of which he may make an independent appropriation under R. C. M. 1947, sec. 89-801, supra, by impounding them in a reservoir. Compare Doney v. Beatty, 124 Mont. 41, 220 Pac. (2d) 77.

An appropriator may not insist upon the upstream release of water which would do him no good; he cannot insist upon the maintenance of a barren right; he may not complain if another user upstream takes waters during times when they would otherwise be lost. Compare Beaverhead Canal Co. v. Dillon Electric Light & Power Co., 34 Mont. 135, 85 Pac. 880.

In arid regions such as are here involved it is essential to provide artificial appliances for the impounding of water for range livestock. Sometimes great distances intervene between natural water places. Frequently natural facilities are inadequate or entirely lacking during dry periods. Stock reservoirs, sometimes called ''water holes,'' may be built either in water courses or away from them. These reservoirs may be filled and replenished from time to time by the capture of diffused surface waters, natural stream accumulations, diversion from streams and otherwise as the watering of stock is one of the specific and separate beneficial purposes for which water may be appropriated.

The relation of a stock reservoir to a water right depends upon the character of the water rights involved. If the water is impounded in or diverted from a water course, the law of water courses applies. If the stock reservoir collects and impounds dif-

fused surface waters then the law governing such class of waters applies.

There is much testimony as to the character of the dry gully which masquerades under the *nom de plume* of Home Creek.

J. L. Midkiff, the plaintiff, testified:

"Q. What kind of a creek is this, living stream, or *dry creek?* A. No, it's a *dry creek.* * * *

"Q. Mr. Midkiff, what kind of a creek is Home Creek? A. Well it's just a *dry creek.*

"Q. Ordinarily *dry creek?* A. Well all of the time a *dry creek.*

"Q. And what sources does it get its water that it carries? A. Well from snow water, rain, flash flood, cloud burst.

"Q. *There is no living water in the creek?* A. *No.*"

Plaintiff's witness, H. G. Young, attorney at law, civil engineer and county surveyor of Rosebud County, who prepared a map of the drainage area for the trial testified:

"Q. I notice several smaller lines, lighter lines, coming into the creek, what are those? A. Those represent the principal branches of Home Creek.

"Q. In other words, tributaries? A. Yes, tributaries.

"Q. Consisting principally of what—*gullies?* A. *Dry gullies.*

"Q. And by the way what's the nature of Home Creek? A. It's a *dry creek.*"

Matt Hjelvik, a witness for plaintiff, who for some 40 years had lived in the vicinity of the Kincheloe and Midkiff ranches, testified.

"Q. Are you familiar with Home Creek? A. Yes, I am.

"Q. What kind of a creek is it? A. It's a *dry creek.*

"Q. Flows at what time? A. Any time you get a shower of rain or when the snow goes off.

"Q. And what would the amount of its flow depend upon? A. Well it depends on the rainfall and how much snow there is and how fast the snow will go.

"Q. Depends upon how fast the rain came or the snow **melted? A. Yes.**

"Q. And also thunder showers or water spouts? A. Yes, sir."

The result of using a dam to reservoir water is to accumulate a quantity of water susceptible of practical use, or to retain water for use when needed. So long as diffused surface waters are on the land owner's lands he has the right to subject them to ownership and use. Compare: R. C. M. 1947, sec. 89-801, supra; Gibbs v. Williams, 1881, 25 Kan. 214, 37 Am. Rep. 241; Turner v. Big Lake Oil Co., 1936, 128 Tex. 155, 96 S. W. (2d) 221; Saguinetti v. Pock, 1902, 136 Cal. 466, 69 Pac. 98, 89 Am. St. Rep. 169; State v. Hiber, 1935, 48 Wyo. 172, 44 Pac. (2d) 1005.

In 1917 plaintiff attempted to irrigate about six acres of land by using brush dams to spread the water. This method was not a success and thereafter plaintiff resorted to the dike system. He testified:

"Q. And what kind of an irrigation system do you have on the land that you use in spreading the water? A. Well I have a dike system, I wouldn't know as there would be any name for it particular other than a dike-flood irrigation system.

"Q. It's what is known as a flood system? A. That is right.

"Q. You have no ditches leading out of Home Creek? A. No.

"Q. You simply divert the water from Home Creek by means of dikes? A. Yes, sir.

"Q. Can you explain and I want you to explain how your system operates, commencing with the east end of your land. A. Yes. Commencing at the east end of my land directly inside of the fence there is a levee and that spreads the water all over the land above the levee. * * *

"Q. And for what purpose are those dikes or levees constructed? A. To spread the water; hold the water back.

"Q. When you say 'spread the water,' just how do they operate? A. Well it comes down against that first one, when that gets full it goes around and comes down to the next one.

"Q. 'When it gets full,' what do you mean? A. When it gets up to the spillway, when the land is covered.

336

"Q. When the land is covered to a certain depth then the water escapes from that dike or levee? A. Yes.

"Q. Are these dikes and levees so constructed as to hold back a certain depth of water on the land that each one serves? A. They are built to hold back a foot of water. * * *

"Q. Is your entire irrigation system of dikes and levees so constructed that it holds back a foot of water on each meadow before it escapes to the next succeeding levee? A. They are built that way.

"Q. Why do you hold a foot of water? A. Well that much water is needed. * * *

"Q. *And what has become of the old creek channel through your meadow?* A. *Well it is automatically filled up and then I dozed it in to fill it up.*"

At the trial the judge inquired of the plaintiff's witness H. G. Young, the county surveyor, concerning plaintiff's system of dikes and was told that the dikes hold back and spread the water over the land. The record further shows the following question by the court and the witness Young's answer, viz.: "The Court: Have we got another project like it in the county? A. There are several of them where they spread it like that, I don't know of any exactly like that but I will say this, *he used a rather ingenious method of spreading the water, perhaps it's not economical.*"

The record is clear that plaintiff has never had a diversion ditch; that he merely fills in with a bulldozer, widens and spreads out the gully and uses the diffused waters therein when and where he finds them and without taking or diverting them from the gully where found. By means of his dikes plaintiff merely retards, deflects, diffuses and spreads the waters out a little more without either capturing or controlling them. Such system is most wasteful. It takes all the water that is ever found in the gully regardless of the water needs and requirements of other landowners. The system does not meet the requirement of our statutes and decisions providing the manner in which waters may be appropriated.

Plaintiff lays claim to all the waters that shall at any time flow in the ordinarily dry gully to the exclusion of all others.

Plaintiff testified:

"Q. How much water of Home Creek do you claim or require? A. I want enough water to flood this here area.

"Q. To what depth? A. One foot.

"Q. How many times? A. *As many times as the creek runs.*

* * *

"Q. Have you at different instances and times taken time to determine the length of time it would require to flood the land under certain flows of the creek? A. I have.

"Q. And in those instances that you have observed, how long did it take? A. *About 12 hours.*

"Q. *And what kind of a flow would it be in the creek to do that?* A. *That would take a good run.*

"Q. A good run. Now you testified I believe that you had 80 acres? A. About.

"Q. And that you required an acre foot of water for the irrigation of those lands? A. Yes, sir. * * *

"Q. What was it you testified to? A. *I testified that I want a foot of water every time the creek flows as far as the water goes.*

"Q. *Well that's what I mean, sir. Every time the creek flows you want up to one foot of water per acre if there is one foot of water, is that right?* A. *That is right.*

"Q. *And you want that every time the creek flows?* A. *Yes, sir.*

"Q. *You even want it when you are haying?* A. *Yes, sir.*

"Q. *And you want it immediately before you hay?* A. *Yes.*

"Q. *It is impossible, is it not, to cut hay with one foot of water on the land?* A. *Can't cut hay then.*

"Q. *But you still want that, nevertheless?* A. *I have no other way, I have got to take it.*

"Q. *That is right, you have absolutely no control over the water at all that comes down Home Creek, you have got to take it at least to one foot, your dikes are so constructed, isn't that right?* A. *That is right.*

"Q. *And there is no way you can divert and send it on around.* A. *No, sir.*

"Q. *And that is true regardless of whether or not you need it or don't need it?* A. *That is right.* * * *

"Q. But if you have an excess it will flow out in flash floods into the Musselshell River, continue down Home Creek into the Musselshell River? A. That is right."

The district judge filed a written opinion in the cause, the opening paragraph whereof correctly recites: "This action involves the use of the waters of Home Creek in the northwest part of Rosebud County, Montana, which is an unadjudicated dry creek, having no permanent source of water supply, and flows in the spring from melting snows and after rainfall sufficient to make it run. It is therefore difficult to measure its flow or to allocate its waters to those desiring to use them."

In its judgment the district court adjudged: That plaintiff have a first, prior and superior right to the waters of the main stem of Home Creek for irrigating his hay land embracing eighty acres "without obstruction or interference of any kind by the defendant; * * * that within 90 days from * * * the entry of * * * judgment, the defendant * * * install a headgate at the bottom of his dam either in the form of a circular pipe 30″ in diameter or any other aperture of equivalent size so that the water to which plaintiff is entitled may be permitted to flow without storage, impounding or diversion thereof and as will permit plaintiff to receive the water to which he is entitled and in case of defendants' failure to install such headgate * * * cut or open his said dam to eliminate the interference thereof with the flow of the waters of Home Creek to which plaintiff is entitled, such removal to be done by the defendant so as not to permit any of the dirt thereof to wash or be carried to, on or over plaintiff's lands and that defendant be and he is * * * permanently enjoined from in any manner obstructing or interfering with the flow of the said water in said creek to, on or over plaintiff's lands or to in any manner interfere with the use thereof by the plaintiff."

Thus in a dry gully wherein it is not only "difficult" as was stated by the trial judge, but utterly impossible to measure the flow or allocate the waters either in miner's inches or in acre-feet of water, would the trial court's decree destroy the usefulness and efficiency of defendant's livestock reservoir so that any and all waters at any time found flowing in the gully up to 80 acre-feet would be allowed to flow without hindrance, and irrespective of whether or not it went to waste, through defendant's reservoir which, when filled to capacity, will hold but 4 acre-feet of water.

The majority opinion, recognizing the injustice of the trial court's order, says "that instead of a pipe being placed at the bottom of defendant's dam a headgate should be installed and the flow of water controlled by flash boards" or other device to the end that defendant may capture and retain in his reservoir whatever water may flow in the stream at a given time in excess of the needs of plaintiff, but here again is presented the problem of determining when the defendant Kincheloe may be allowed to capture and store water and when he must let it flow without hindrance. If a flash flood produced exactly 84 acre-feet of water possibly then the defendant Kincheloe would be allowed to capture and store in his reservoir 4 acre-feet, being the maximum capacity thereof, and then allow the remaining 80 acre-feet to continue down to plaintiff's project, but what is the answer when the melting snows or the rains produce but 1, 2 or 3 acre-feet or any number of acre-feet less than the 80 acre-feet claimed by plaintiff each and every time there is a spring run-off, a flash flood or water of any sort flowing in the gully. Again because the plaintiff Midkiff lays claim to 80 acre-feet of water to carry on his project on 65 acres of hay meadow does not show that he is entitled to that or any other amount or that such amount is required to meet his actual needs.

The 80 acre-feet claimed by the plaintiff Midkiff is a lot of water. Four acre-feet, the capacity of defendant's reservoir, is but one-twentieth as much. It would take all the water in 20 such reservoirs as defendant's filled to capacity to supply the

amount of water which plaintiff claims he needs for irrigating but 65 to 80 acres of hay meadow in the wasteful method and practice which he employs.

In my opinion only the defendant Wade Kincheloe has complied with the statute and only he has made a valid appropriation. His right to use his reservoir to impound the waters which he requires for a recognized beneficial use should be respected and adjudged. R. C. M. 1947, sec. 89-801.

The plaintiff Midkiff has the same right to build on his own lands an efficient dam and reservoir capable of capturing, storing and controlling the diffused surface waters found running to waste upon his lands and to thereafter put the waters so impounded to beneficial use as has the defendant but this the plaintiff has not seen fit to do. He has no dam. He has no reservoir. He cannot capture the flood, seepage or waste waters. He cannot impound them. He admits he cannot control them. His system of dikes accomplishes none of these results nor does it prevent the water in the gully from running to waste.

The defendant Kincheloe has constructed a good dam. He has built an efficient reservoir. He can capture and impound as much as 4 acre-feet of water and when once impounded he may control it and place it to beneficial use in the watering of his livestock.

The defendant Kincheloe has the same right to impound and store in his reservoir on his own lands the diffused surface waters running to waste thereon that he has to gather or collect in a rain barrel or a cistern the waters from snows or rains as they run from the roofs of his dwelling or barn.

In my opinion the majority decision denies the defendant Kincheloe a right recognized in the state Constitution to build on his own land a dam and reservoir for the collecting and storing of flood, seepage and waste waters to the end that such waters be put to a beneficial use. Thus is the defendant denied and deprived of property rights to which he became and is entitled by reason of having complied with the law governing same. I therefore dissent.