No. 81-240

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE EX REL., ROBERT H. WILSON,

        Relator and Appellant,

  -vs-

DEPARTMENT OF NATURAL RESOURCES AND
CONSERVATION OF THE STATE OF MONTANA,
Water Resources Division,

        Respondent and Appellant,

  -vs-

WILLIAM H. WALTON AND MARION WALTON,

        Intervenors and Respondents.

Appeal from:  District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, The Honorable
James B. Wheelis, Judge presiding.

Counsel of Record:

    For Appellant:

        Hooks & Budewitz, Townsend, Montana
        Patrick F. Hooks argued, Townsend, Montana

    For Respondents:

        Josephson & Fredricks, Big Timber, Montana
        Conrad B. Fredricks argued, Big Timber, Montana

Submitted: **JUL 14 1982**

Decided:  July 14, 1982

Filed: **JUL 14 1982**

*Thomas J. Kearney*
                Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

This appeal arises from the District Court's granting attorney's fees to Intervenors following a hearing to determine water rights, in the Thirteenth Judicial District, Yellowstone County. We reverse the District Court.

The sole issue on appeal is whether Intervenors (Waltons) are entitled to attorney's fees from Relator (Wilson). Wilson and Waltons owned adjacent property in Yellowstone County. Waltons purchased their property in 1963, and in 1966 built a structure to impound water from an unnamed tributary (coulee) of Dry Creek to use as a stock water reservoir. They continued this use each year after their dam was built. In 1970 Wilson purchased land just up the coulee from the Walton land. In 1975, Wilson built a road across the coulee, cutting off virtually all of the flow to the Walton reservoir, and creating his own stock water reservoir. He knew of the Walton dam at the time. He did not apply for a beneficial water use permit from the Department of Natural Resources and Conservation (DNRC), as required by the Montana Water Use Act of 1973, §89-880(2), R.C.M. 1947 (now sec. 85-2-302, MCA). Waltons' protests to Wilson and Wilson's lawyer, that the roadway blocked off the water they depended on to water their stock, were unavailing.

In fall of 1976, Waltons protested Wilson's actions to the DNRC. A subsequent on-site inspection by the DNRC resulted in their informing Wilson he was in violation of the Montana Water Use Act and must obtain a beneficial use permit before appropriating water from the coulee, or he would be subject to misdemeanor charges. Wilson applied for such a permit in February of 1977; the application was

-2-

noticed by publication.  In May of 1977, Waltons filed

timely objections to issuance of the permit and in October

of 1977, filed timely amended objections.

On December 21, 1977, the DNRC, in an attempt to informally

settle the dispute, sent the following letter:

> "Dear Mr. Wilson:
>
> "This is in reference to your Application
> No. 11761-s43Q and the objection of William
> and Marion Walton.  A review of the applica-
> tion and objection shows that the watershed
> above the objectors' dam will yield approxi-
> mately 15-20 acre-feet of water on an average
> year.  This will vary from year to year.  The
> objector claims a prior water right for ap-
> proximately 8 acre-feet for stock watering,
> which indicates the availability of appro-
> priable water.  It appears they have a valid
> use right to the maximum amount of water he
> has put to a beneficial use prior to July 1,
> 1973, as our records show no filed appropria-
> tion.
>
> "Under the law we are required to ensure prior
> existing water rights will not be adversely
> affected and that the means of diversion or
> construction are adequate.  We propose to
> issue your permit subject to the following
> conditions in order to do so.
>
> "1.  All prior existing water rights.
>
> "2.  Any final determination of existing water
> rights as provided by Montana law.
>
> "3.  The permittee shall install and maintain
> a drainage device not less than 12 inches in
> diameter, in the bottom center of said dam in
> order to satisfy prior existing water rights.
>
> "4.  The permittee shall submit to the Depart-
> ment his plans for the design of the emergency
> spillway and drainage device for approval before
> their construction and installation.
>
> "A 10 year frequency 6 hour storm would cause
> a peak flow of 8 cfs.  Your spillway and drain-
> age device should be designed to pass a combined
> flow of at least that amount.  As your dam as
> proposed will hold only one acre-foot, it would
> be probably overtopped without a spillway.
>
> "Please notify us in writing within seven (7)
> days after receipt of this letter if you do
> not agree with our findings and proposal and
> request a hearing on your application.  If we
> do not hear from you we will assume you do
> not request a hearing and issue your permit
> accordingly."  (Emphasis added.)

Subsequent exchanges between Wilson and the DNRC indicate Wilson's feeling that the DNRC had already determined rights without a hearing. Wilson also argued that Waltons could not have established rights in diffuse surface water prior to 1973, because common law did not recognize such water as subject to appropriation. The DNRC responded that it had made no final determinations as to rights and that Wilson could challenge its preliminary findings by requesting a hearing.

On June 27, 1978, the DNRC notified the parties that hearing on Wilson's application would be July 12, 1978. On July 7, 1978, Wilson obtained an alternative writ of prohibition from the District Court ordering the DNRC to refrain from further proceeding on his application, for failure to hold its hearing within 60 days, as required under section 85-2-309, MCA. In November, 1978, with no objection from Wilson, Waltons were permitted to intervene. Both the DNRC and Waltons sought an injunction against the Wilson dam; Wilson and Waltons sought adjudication of their rights to the coulee water.

Following a June 1, 1979, hearing, the District Court granted the writ of prohibition; appeal from that decision was dismissed by this Court on the grounds that the District Court's decision lacked finality.

After a trial without jury on July 29-30, 1980, the District Court granted injunctive relief against Wilson, holding that the coulee water was more than mere surface water; it was "water" within the meaning of the Water Use Act, and Waltons had a valid prior right to the water; the court awarded attorney's fees and costs to Waltons; Wilson was awarded attorney's fees against DNRC.

On December 23, 1980, Wilson moved to have the award of attorney's fees to Waltons stricken, arguing that "there is

no statutory, contractual or other basis upon which to base [the] award. . ."

The District Court judge amended his findings and conclusions on December 29, 1980, to include the following:

"FINDINGS OF FACT

"26. The construction of the dam by the Relator was done in disregard of the Intervenors' obvious prior rights.

"27. The construction of the dam and the litigation that ensued cost the Intervenors to seek legal counsel and to participate in litigation.

"28. It would be inequitable for the Intervenors, innocent as they were to any wrong doing, to bear the costs for attorneys fees in litigation.

"CONCLUSIONS OF LAW

"19. The court has inherent power under its equity jurisdiction to grant attorneys fees to the Intervenors against the Relator."

Relator Wilson appeals.

On February 5, 1982, this Court, in response to written stipulation by Wilson and the DNRC, ordered that (1) the writ of prohibition be set aside; (2) the award to Wilson of attorney's fees against the DNRC be vacated; (3) the DNRC's appeal be dismissed; and (4) Wilson and the DNRC should each bear their own costs. Wilson has formally withdrawn the application for a beneficial water use permit for the coulee water and has ceased to impound the coulee water. The sole issue on appeal is whether the District Court erred in awarding attorney's fees to the Waltons.

Waltons rely upon several statutes under which attorney's fees may be awarded.

Section 85-2-125, MCA, provides:

"If a final decision of the department [DNRC] on an application for a permit is appealed to district court, the district court shall award the prevailing party reasonable attorney fees."

-5-

Wilson points out that here there was no appeal, no final decision; there was not even a hearing by the DNRC regarding his application for a permit. The only DNRC decision was that Wilson would have to file for a permit before he could build an impoundment structure; that decision preceded his application for a permit and was not appealed. The DNRC hearing on the matter was precluded by the DNRC's delay and Wilson's writ of prohibition. Section 85-2-125, MCA, is not applicable here.

Waltons also rely upon section 27-1-317, MCA, which provides:

> "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

Waltons maintain that because Wilson's wrongful acts forced them to bring an action in intervention to their detriment, section 27-1-317, MCA, is applicable. Wilson counters that section 27-1-317 has never been so broadly interpreted and to apply it here would extend the award of attorney's fees to every prevailing personal injury claimant in a non-contract action.

The long-established rule in Montana is that, in the absence of some special agreement between the parties or statutory authorization, attorney's fees are not recoverable by the successful litigant. Nikles v. Barnes (1969), 153 Mont. 113, 454 P.2d 608; Kintner v. Harr (1965), 146 Mont. 461, 408 P.2d 487. Clearly there was no agreement between the parties in the case at bar. But Waltons would have us find "statutory authorization" in section 27-1-317, MCA, above, and in the references made to that statute in First Security Bank of Bozeman v. Goddard (1979), 181 Mont. 407, 420, 593 P.2d 1040, 1047, and in McCarty v. Lincoln Green, Inc.

-6-

(1980), _____ Mont. _____, 620 P.2d 1221, 1225, 37 St.Rep. 2007, 2011-2012. We do not find those cases applicable here. There is no specific mention of section 27-1-317, MCA, as applying to attorney's fees in Goddard. In McCarty, although an award of "damages plus attorney's fees" was challenged by appellant, this Court, in affirming, relied upon the statute in justifying the award of damages but never explicitly discussed attorney's fees. Besides, both Goddard and McCarty involved actions in tort; no tort liability has been alleged or found in the case at bar. Both the general rule stated in Nikles, above, and section 27-1-317, MCA, have been around for some time, yet this Court has not explicitly applied it to a request for attorney's fees. We decline to expand the Nikles rule to support an award of attorney's fees in this case.

Finally, and more in line with the findings and conclusions of the trial court, Waltons rely upon the relatively new line of case law in Montana establishing a narrow exception to the rule stated in Nikles, supra. This Court, in a number of recent cases, has recognized the lower court's general equity power to make an injured party whole and held that, in some isolated cases, attorney's fees could properly come within that power. Such an award is within the lower court's discretion and will not be overturned absent a showing of abuse of discretion. Martin v. Randono (1981), _____ Mont. _____, 623 P.2d 959, 962, 38 St.Rep. 209, 212. Cf. Stickney v. State of Montana, County of Missoula (1981), _____ Mont. _____, 636 P.2d 860, 38 St.Rep. 1991; Joseph Russell Realty Company v. Kenneally (1980), _____ Mont. _____, 605 P.2d 1107, 37 St.Rep. 57; Holmstrom Land Co. v. Hunter (1979), _____ Mont. _____, 595 P.2d 360, 36 St.Rep. 926; Foy v. Anderson (1978), 176 Mont. 507, 580 P.2d 114; comment, 40 Mont.L.Rev. 308 (1979).

In _Joseph Russell Realty Co._ and _Martin_ we affirmed the trial court's refusal to award attorney's fees, while recognizing its equitable power to do so. In _Foy_, _Holmstrom_ and _Stickney_, we affirmed the trial court's equitable award of attorney's fees, where defendants, through no fault of their own, were forced to personally defend against a frivolous action.

Wilson argues that the _Foy_ line of cases is not applicable here. In those cases, the defendants were made party to a frivolous action. It is true that Wilson did not sue Waltons; they voluntarily made themselves parties by intervening. But, at the time they intervened, Waltons had been deprived of the upper coulee water for nearly three years. Their requests for enough water to keep their stock pond full were ignored by Wilson and his attorney. Waltons' 1976 complaint to the DNRC culminated two years later in the DNRC's loss of jurisdiction over Wilson's application for a permit to impound the coulee waters. The District Court would determine rights to those waters, an adjudication to which DNRC admittedly was not a real party in interest. Clearly, the only way the Waltons could hope to protect their interest in the coulee waters was to intervene.

We find there is room within the _Foy_ exception for those who reasonably find it necessary to intervene in a frivolous action, although not technically forced to become parties.

Wilson argues that this was not a frivolous action, one so spurious as to bring it within the _Foy_ exception. He maintains that there was a genuine controversy; that the law was such that he reasonably could have expected to prevail; that his position was supported by credible expert evidence; in short, that, although he did not prevail, the record clearly reflects a viable claim.

Wilson alleged throughout the litigation that the coulee water was "diffuse surface water," and was not "water" within the definition of the Water Use Act. He also claimed that Waltons had no valid prior appropriation right to the coulee water because diffuse surface water, at common law, could be impounded by the person upon whose land it occurred, but was not a "water course" and was not subject to the law governing water courses. He emphasizes that he does not and need not challenge the merits of the District Court's determinations with respect to these matters. He only must prove that his position in the litigation was not frivolous or spurious, and hence should not have been brought within the Foy exception. Let us consider Wilson's arguments.

(A) Wilson argues that he believed "diffuse surface water" was not "water" within the meaning of the Water Use Act and hence believed the provisions of the Water Use Act did not apply to his stock water reservoir.

The Water Use Act of 1973, §89-867(1) R.C.M., 1947, (now section 85-2-102(14), MCA), originally defined "water" as ". . . all water of the state, surface or subsurface, regardless of its character or manner of occurrence, including geothermal water." That definition was amended in 1977 to include "diffuse surface water." The minutes of a meeting of the Senate Committee on Agriculture, Livestock and Irrigation (March 17, 1977) show that one DNRC official considered the inclusion an "important change"; another was satisfied that the amendment would force the Bureau of Land Management to obtain a water use permit for diffuse water. Wilson argues that this amendment was necessary to prevent confusion reasonably arising under the original definition, which was in effect when he impounded the coulee water.

Wilson's confusion derived in part from the fact that diffuse surface water, at common law, was <u>not</u> subject to the same rules governing appropriation as were applied to water which flowed in a natural water course. Wilson relies upon Doney v. Beatty (1950), 124 Mont. 41, 220 P.2d 77, and authorities cited therein:

> "<u>As to such diffused waters the plaintiffs did not and they cannot make a valid appropriation for use on their lands located a number of miles below, and the defendants have the right to collect, capture and impound such diffused surface drainage while it is on their own lands and farms for use thereon.</u>" (Emphasis added.) 124 Mont. at 50, 220 P.2d at 82.

Waltons maintain that <u>Doney</u> was effectively superceded by Midkiff v. Kincheloe (1953), 127 Mont. 324, 263 P.2d 976, wherein this Court upheld the prior right of a downstream user in a water rights dispute factually similar to this one, although the water was only rain and snow runoff in an otherwise dry creek. We point out that in <u>Midkiff</u>, the issue of whether diffuse surface water could be appropriated was not before the Court. The Court considered only the extent of the prior use, before the upstream user impounded the runoff waters. Furthermore, Justice Adair, in a strong dissent referred to the <u>Doney</u> rule, and clearly articulated the common law rule that an upstream user

> ". . . has the same right to impound, store and put to beneficial use these flood and waste waters while they are upon his lands as has the [downstream user] when they reach his holdings.
>
> ". . .
>
> "It is the general rule that diffused surface waters resulting directly from rain and melting snow may be collected, impounded and put to a reasonable beneficial use by the owner of the land on which they occur, so long as such waters remain on such owner's land. In the event the landowner makes a reasonable use of waters resulting from rain and melting

snow, and particularly of such as result from precipitation on his own land, such waters may be treated as 'flood, seepage, and waste water' of which he may make an independent appropriation under R.C.M. 1947, sec. 89-801, supra, by impounding them in a reservoir. Compare Doney v. Beatty, 124 Mont. 41, 220 Pac. (2d) 77." 127 Mont. at 332-333, 263 P.2d at 980.

In light of the 1977 amendment of the definition of "water," and the common law rules with regard to appropriation of diffuse surface water, we find that Wilson reasonably could have believed diffuse surface water was not subject to the provisions of the Water Use Act in 1975 when he built his road.

(B) Wilson argues that there was a genuine controversy as to whether the coulee water was diffuse surface water.

In Doney v. Beatty, supra, 124 Mont. at 51, 220 P.2d at 82, this Court contrasted a water course with diffuse surface waters:

"A water course in general has a definite channel as well as a flow of water while diffused surface waters are waters which, in their natural state, occur on the surface of the earth in places other than water courses or lakes or ponds. The diffused surface waters may originate from any natural source. They may be flowing, vagrantly over broad lateral areas or, occasionally for brief periods, in natural depressions, or they may be standing in bogs or marshes.

"The essential characteristics of diffused surface waters are that their flows are short-lived and that the waters are spread over the ground and not concentrated or confined in channel flows of legal watercourses nor yet concentrated or confined in bodies of water conforming to the definition of lakes or ponds.

"In 1 Kinney on Irrigation and Water Rights, 2d Ed., in discussing water courses in section 301, at page 486, the author quotes with approval the definition of a water course appearing in an Idaho case, as follows: '"A water course is a stream of water flowing in a definite channel, having a bed and sides or banks, and discharging itself into some other stream or body of water. The flow need not

-11-

be constant, but must be more than mere surface
drainage occasioned by extraordinary causes;
there must be substantial indications of the
existence of a stream which is ordinarily a
moving body of water".' Again in section
312, Kinney says: 'But a water course does
not include holes, gullies, or ravines in
land, in which mere surface water from rain
or melting snow at irregular periods, is dis-
charged through them from a higher to a lower
level, and which at other times are destitute
of water. In the absence of a permanent
source of water supply there can be no water
course in its legal sense.' Emphasis sup-
plied. See: 1 Wiel on Water Rights in the
Western States, 3d Ed., page 354, sec. 334;
LeMunyon v. Gallatin Valley Railway Co., 60
Mont. 517, 199 Pac. 915."

And in the dissent in Midkiff v. Kincheloe, supra, Justice

Adair discussed the kind of water which could be appropriated

by the land owner as long as it was on his lands. That

water included "flood, seepage, and waste waters." The

water of the gully in Midkiff "[came] directly from either

melting snows or heavy rains that have fallen upon the

surface of the lands of Kincheloe and others lying within

the drainage area of the gully," and were unquestionably

diffuse surface waters according to Justice Adair. We

repeat that Justice Adair objected to the majority's failure

to consider and apply the existing law regarding water

courses and diffuse surface waters, not their contrary

application of it.

Here, it is true, the coulee also contained several

developed springs above the Wilson dam. But the witnesses

testified that the coulee was dry at least half the year,

and that nearly all of the water in it was snow-melt and

rain runoff. At least one expert (Wilson's) testified that

he could find no clearly-defined channel, and no evidence of

moving water, although he spent many hours on the property.

Another testified that the plants in the bottom of the

coulee were of a type which could not grow in rapidly flowing

-12-

water.

There is no definition of diffuse surface water in the Water Use Act. We find that Wilson reasonably relied upon the common law for a definition of diffuse surface water. That definition was similar enough to the waters of the coulee, that, given the supporting expert's information, Wilson's position was not without merit.

(C) Finally, Wilson argued that he reasonably believed Waltons had not obtained a prior right to the coulee water before the effective date of the Water Use Act, July 1, 1973. The common law rule, which Wilson believed applied to the Waltons' impoundment of the coulee waters, if they were diffuse surface waters, was that Waltons could only impound those runoff or waste waters which flowed on their own land. An upstream user could appropriate those diffuse surface waters occurring on his land. Therefore, Wilson believed that, as Waltons had not applied for a beneficial use permit under the Water Use Act after July 1, 1973, they had no superior claim to the coulee waters.

Wilson has not challenged the District Court's determination that:

(1) Waltons had a prior right to the coulee waters;

(2) The coulee waters were more than mere surface waters; and

(3) The coulee waters were subject to the provisions of the Water Use Act.

He simply argues that considering the evidence before the District Court, that court improperly invoked its equity power in awarding attorney's fees to the Waltons. We agree.

This Court will not overturn findings of fact of a District Court where they are supported by substantial, though

conflicting evidence, unless there is a clear preponderance of evidence against such findings. The evidence is to be viewed in the light most favorable to the prevailing party. Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939.

Clearly, the District Court believed that Wilson had acted improperly in constructing his dam without first obtaining a beneficial use permit from the DNRC, in blocking off virtually all the Waltons' coulee water, knowing they had impounded it previously, and in prohibiting the hearing of his own petition for a beneficial use permit. But the Foy exception has been narrowly drawn, and is applicable only where the action into which the prevailing party has been forced is utterly without merit, or frivolous. In Foy, Holmstrom, and Stickney, the parties who were awarded attorney's fees had been forced to defend themselves in actions which could not reasonably have been seen as viable, actions in which the court was used more as an instrument of harassment than as a means to settlement of a legitimate dispute.

Here the preponderance of evidence supports Wilson's argument that his position, while it did not prevail, could not be classed as spurious. Wilson has presented persuasive arguments, discussed above, supporting the apparent viability of his claim. And we find that while Wilson indeed encroached upon prior rights of the Waltons, those rights were not "obvious prior rights," and Wilson had a reasonable basis to believe that he might establish his right to capture snow melt and runoff while it was on his land. Therefore, to the extent that the District Court found Wilson's encroachment to be upon an obvious prior right, we vacate its amended finding of fact No. 26. And because Wilson had a reasonable basis to believe that his cause might prevail, we find that his action

was not frivolous or utterly without merit, the Foy exception is inapplicable, and the District Court erred in awarding attorney's fees to the Waltons.

We remand this cause to the District Court for correction of its February 5, 1982, order insofar as it grants attorney's fees to the Waltons.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
District Judge